ACME ALUMINUM ALLOYS, INC. *vs.*
PANTEX MANUFACTURING CORPORATION *et al.*
PANTEX MANUFACTURING CORPORATION *vs.*
ACME ALUMINUM ALLOYS, INC.

MARCH 18, 1949.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

CONDON, J. These actions of assumpsit were tried together before a justice of the superior court without a jury and resulted in a decision in each case for Acme Alumnium Alloys, Inc., hereinafter referred to as Acme. To each decision Pantex Manufacturing Corporation, hereinafter referred to as Pantex, excepted, and the cases are here on its bills of exceptions.

Each cause of action arose out of an oral agreement by which Acme undertook to manufacture certain aluminum castings for Pantex according to specifications made known to Acme's foundry superintendent, Arthur J. Tate, who made a personal visit to the Pantex plant in the city of Central Falls in this state for that purpose in the spring of 1945. These castings were for the "heads" of pressing machines manufactured by Pantex. As a result of Tate's visit and conference with certain officials of Pantex, Acme made a large number of castings during the latter part of 1945 and the first half of 1946 and these were readily accepted for the most part with very little complaint, and were paid for by Pantex. However, in May 1946 a difficulty arose over the appearance of so-called "pin hole porosity" in the castings of certain highly polished heads of four particular models. This defect was described as "a small hole or series of holes appearing on the face of a casting after it has been machined and polished; it is not a leak * * *." And it was further differentiated from a leak as follows. A leak in the casting allows the steam in the head of the pressing machine to escape, but pinhole porosity does not.

Pantex claimed that this defect made the castings wholly unfit for the purpose for which they were manufactured and, after some correspondence and negotiations about the matter, sent them back to Acme accompanied by a demand for refund of the price which had been paid for them. Acme denied that it was obligated to that extent and accepted the returned castings only as scrap at the rate of 10 cents per pound, and gave Pantex credit therefor. There was a considerable balance on Acme's books due from Pantex for other castings which had been delivered and accepted. Pantex, however, refused to pay such balance as it claimed several thousand more dollars were due to it for defective castings which had been returned to Acme.

Litigation to settle the controversy was initiated by Acme. On July 9, 1947 it brought an action in assumpsit on book account and the common counts for a balance of $3796.89 alleged to be due for castings which Pantex had accepted. Thereafter on September 9, 1947 Pantex brought its action in assumpsit for breach of warranty and claimed that the sum of $9149.56 was due for defective castings which had been returned and which it claimed Acme had accepted but for which a credit of only $1923 was given. The defendant in each case pleaded the general issue.

At the conclusion of the evidence in the superior court, it appearing without contradiction that on its books Acme had given Pantex an overcredit of $3760, Acme was allowed over the objection of Pantex to amend its writ and declaration to conform to the evidence and to increase the *ad damnum* from $5000 to $8000. Pantex excepted to that ruling and has also prosecuted this exception in its bill of exceptions. This will be considered later when we discuss its exception to the trial justice's decision on the merits.

We shall discuss first the exception of Pantex to the decision in the case brought by it against Acme. In that case the trial justice, after reviewing the evidence at some length, found that Pantex had not proved either an express warranty or an implied warranty which it had alleged in

its declaration. He specifically found that the statement of Acme's agent in negotiating the agreement with Pantex' agents that the castings would be "perfectly suitable for the Pantex machine" was mere "seller's talk" and did not amount to a warranty that the castings would be free from pinhole porosity. He also found that the conversation between the parties' agents concerning the kind of castings which Pantex desired and which Acme agreed to produce did not amount to a "guarantee" that Acme would deliver castings that were free from defects caused by "porous material or leaky material." He, therefore, rendered a decision for Acme.

Pantex contends that in thus deciding the trial justice erred for the reasons: "(A) on the undisputed facts in the case Acme warranted to Pantex that the castings would be free from defects which would make them unsuitable for Pantex's purposes, and (B) by accepting the rejected castings, Acme became obligated to credit Pantex for the purchase price thereof." Consideration of those contentions necessitates a somewhat detailed review of the evidence.

The transcript discloses that early in 1945 Pantex had experienced difficulty in obtaining iron castings and that it was also having trouble with leaks in castings which were being produced for it by a foundry in Syracuse, New York. In an effort to overcome those difficulties Pantex solicited Acme to undertake the production of the castings with alumnium instead of gray iron. Pantex had never before used aluminum castings and Acme had never made any castings for the particular purpose required in Pantex' machines. Nevertheless Acme sent its foundry superintendent, Arthur J. Tate, to the Pantex plant to consider the proposal. He was accompanied by Robert B. Diffin, eastern sales representative for Acme. At the plant Tate talked with Walter Gray and Stephen P. Wasnok, purchasing agent and assistant works manager respectively of Pantex. They took him on a tour of inspection of the plant, showed him the pressing machines they were making and

described how the machines functioned. They also pointed out the qualities required in the castings for the polished heads of the machines. He was also told of the trouble they were having with the iron castings from the Syracuse foundry.

The upshot of Tate's visit and inspection was that he assured Gray and Wasnok that Acme could do a better job than they were getting and would give them suitable castings or take them back. Diffin and Gray testified definitely to that effect. Tate testified that he had no conversation in which he agreed to take back any castings at full price. He did not deny, however, that he stated Acme would make suitable castings. In any event as a consequence of his assurance as understood by Gray, Pantex gave Acme a trial order for certain castings and sent patterns for their molding to Acme's foundry at Dayton, Ohio. Pursuant to such order Acme produced the castings and shipped them to Pantex on June 20, 1945.

Those castings were tested by Pantex at its plant to determine whether they were "pressure proof." The testing was done by machining and polishing the castings. It was admitted that this could not be done by Acme because at the foundry the only finishing that was done was the removal in the cleaning room of so-called "gates and risers" on the castings which in that process were "rough ground" but "not polished." In other words, it is undisputed that inherent defects such as leaks or pinhole porosity in the castings could only be determined by machining and polishing at the Pantex plant. The trial order successfully met that test but since it was such an order Acme did not charge Pantex for it.

Thereafter Pantex gave more orders to Acme accompanied by the necessary patterns for the castings, and on July 23, 1945 the first order was shipped to Pantex, for which it paid the agreed price. Orders in increasing numbers followed until November 11, 1946. Substantially all castings shipped during that period were found suitable and

paid for without question. Only about 5 per cent were rejected and it is not disputed that this was a normal proportion. Each of those rejections was adjusted by Acme accepting return of the defective castings and giving Pantex full credit for the price paid therefor, except in one instance, wherein Pantex claimed the castings were soft and there was a disagreement as to who was responsible for them. The dispute was amicably adjusted by Acme giving Pantex a credit of 50 per cent of the price of the order. That was the only serious dispute that arose over the fitness of thousands of castings until about the end of May 1946 when pinhole porosity developed in orders of four models of highly polished castings.

On June 5, 1946 Pantex telegraphed Acme of this defect and urged that it be promptly corrected. A further telegram inquiring what had been done about the complaint was sent June 12, 1946. A letter more fully describing the defect was also sent. As a result Tate made a personal call at the Pantex plant and after talking with officials there said that the matter would be corrected. However, all orders for these particular models continued to show pinhole porosity and finally Pantex began sending back these castings and claiming full credit. Acme did not accept the returned castings in accordance with the claim which Pantex made for full credit, but allowed it a credit for them at the rate of 10 cents per pound as scrap. Acme neither admitted nor denied that the castings were defective as it had no means of testing them for pinhole porosity. Apparently the only reason which it first advanced for not allowing full credit was that Pantex had not returned the castings within 60 days in accordance with a notice to that effect appearing on the invoices accompanying the shipments.

Pantex' division superintendent at Central Falls, Howard F. Beety, testified that after machining and polishing the castings in question not one of them was found to be free from pinhole porosity. However, according to his testi-

mony all of the castings were not so tested but only a certain proportion of them in each order. He said that after testing ten out of an order of twenty-five, for example, and finding them defective he directed the whole order to be sent back. It was too costly, he said, to test each casting and so a large quantity was sent back without testing. At first, before he returned any of them, he tried various methods to obviate the defect but without success. This consumed some time but finally all castings in an order were sent back when the test disclosed a third of the order was defective. He admitted that pinhole porosity could not be discovered by a visual inspection of the castings as they came from the foundry but only after they had been machined and polished at the Pantex plant.

We are of the opinion that Acme agreed to produce good and suitable castings fit for the purpose which Pantex' agents had made known to Tate. We think also that the evidence greatly preponderates in favor of the view that Tate made statements at the inception of the agreement that were not mere "seller's talk" but in the circumstances under which they were made were express warranties that the castings would be fit for the special purpose intended. No particular form of words is necessary to create a warranty. *Ingraham* v. *Union Railroad Co.,* 19 R. I. 356. "A warranty is a statement of fact as to an article sold, coupled with an agreement to make the statement good." *Handy* v. *Waldron,* 18 R. I. 567.

Diffin testified in the case at bar that Tate said Acme would give satisfactory castings or would take them back. He further testified that Tate said Acme had a good reputation, was able to produce good castings and would stand behind its products. Gray testified he told Tate that certain castings must have a clean, smooth surface so they could take a high polish and that Tate said his foundry could do the work and would stand behind their product and give complete satisfaction. On this point Tate was evasive as the following testimony discloses: "CQ. As a matter

of fact, didn't you say on many occasions that you would stand behind your castings 100 per cent? A. I probably did. I don't know what you mean by 100 per cent. CQ. But you did say that, or words to that effect, didn't you? A. I don't remember. CQ. You wouldn't say you didn't, would you? A. I wouldn't say I did. CQ. But you wouldn't say you didn't, would you? A. I can't remember saying it."

That Acme itself understood it was obligated to reimburse Pantex for castings which were shown to be defective is obvious from its own documentary evidence showing it actually allowed full credit to Pantex for numerous rejected castings and also from their own letter of January 14, 1947 to Pantex in which they said: "Had these defective castings been returned within the 60-day limitation, credit or replacement would have been in line." Pantex argues that this evidence is undisputed. While this is not precisely true, nevertheless the evidence is so overwhelming in weight as to support Pantex' claim that the trial justice erred in finding that Acme had not expressly warranted its castings to be fit for Pantex' purposes. In any event such evidence clearly supports the contention that in the circumstances in which the agreement was entered into there was at least an implied warranty that the castings were fit for the purposes intended. See the provisions of the Sale of Goods Act, general laws 1938, chapter 459, §15 (1).

The next question is whether Pantex is precluded from enforcing such warranty because of its failure to return the rejected castings within the 60-day period set out in the invoices. It is undisputed that each shipment of castings to Pantex was accompanied by an invoice bearing the following notice: "Defective castings cannot be returned for credit after 60 days from delivery." We are of the opinion that in the circumstances here Acme cannot avail itself of that notice to escape its obligation under the warranty. There is no evidence that at the inception of the agreement such a condition was ever mentioned. Nor was it ever

applied to any of the rejections for which credit was given although many if not all of them were made after the 60-day period. Even in the case of the rejections with which we are concerned here Acme did not notify Pantex that the rejected castings would not be accepted for full credit because that notice had not been complied with. On the contrary, as each shipment of alleged defective castings was received in November and December 1946 Acme accepted it, and not until January 14, 1947 did it inform Pantex that full credit would not be allowed because the castings were returned "after 60 days from delivery."

In view of those facts we think it would be unjust to hold Pantex to the letter of a notice on an invoice and especially since some of the delay was due both to the necessity of testing for defects and to the efforts of Pantex to devise some means by which the castings could be made usable despite the defect of pinhole porosity. Those efforts were in Acme's interest as much as in the interest of Pantex. If Acme had shown that Pantex' delay after it had accepted delivery of the castings was otherwise unreasonable we would be compelled to hold that it was not liable for breach of its warranty of the castings. Sale of Goods Act, G. L. 1938, chap. 461, §9. But, in our opinion, there is no evidence in the record of such unreasonable delay.

There is one final question to be determined before it could be said that Pantex is entitled to the full credit which it is claiming for the alleged defective castings that were returned. That question is whether Pantex proved that each casting was defective because of pinhole porosity. Under the agreement it was Pantex' duty to determine that fact and acquaint Acme with it before the latter would be obliged to allow Pantex credit for such defective casting. Acme had no means of determining whether a casting before it was polished had such a defect. The determination of that fact lay with Pantex if the casting when received from Acme was otherwise perfect.

The uncontradicted evidence is, according to Pantex' own factory superintendent, that at the most only one third of each shipment returned to Acme as defective was actually found to be so by test. The other two thirds were merely assumed to be defective. Since it was conceded that pinhole porosity could not be discovered by visual inspection before a casting was machined and polished and since there was no evidence that according to the practice of the foundry trade a defect in two or more castings in a batch was proof that the whole batch was necessarily defective, it is obvious that Pantex only partially performed its obligation of showing a defect in each casting to entitle it to damages for a specific breach of warranty on Acme's part, namely, failure to produce each casting free from the defect of pinhole porosity.

It is difficult to assess the amount of the damages to which Pantex is entitled. However, after carefully considering all the evidence we are of the opinion that substantial justice between the parties will be accomplished by allowing Pantex credit for one third of the amount of $9149.56 which it is claiming, or $3049.85.

We shall now consider the exceptions in the case brought by Acme against Pantex. We are of the opinion that the trial justice did not err in allowing Acme to amend its writ and declaration. At the opening of the trial Pantex admitted that Acme's books if produced would show that Pantex owed the balance claimed in Acme's declaration. During the trial Pantex' agent admitted that through error Acme had given Pantex an overcredit of $3760. This was undisputed, but in argument Pantex' counsel contended that there was no legal proof of this error. We agree with the trial justice that to accede to that contention and force Acme to bring another action in the face of Pantex' concession of erroneous credit given to it by Acme would be needless and wasteful. We find that no prejudice resulted to Pantex by the trial justice's ruling, and its exception thereto is overruled.

After carefully reviewing the evidence we are of the opinion that Pantex' exception to the trial justice's decision on the merits should also be overruled. Its principal contention is that there is no legal evidence to support the inclusion of $3760 in the award of damages because it was not proved by the production of books of account but by loose-leaf ledger sheets or memoranda. Pantex argues that a claim of book account may be proved only by pages or cards of account bound substantially together in book form. Counsel cites cases from foreign jurisdictions which he claims support that proposition. As to that we need not pause here to inquire, as the practice in this jurisdiction has been to permit loose-leaf ledger sheets to be admitted in evidence as books of account if they are not otherwise impeached because of the unusual or suspicious manner in which they appear to have been kept. Here there was no objection to the introduction of the ledger sheets. The trial justice had the benefit of this evidence and saw fit to accept it. We can find nothing in the transcript that would justify us in holding that he was clearly wrong in doing so. Nor can we say that on a reasonable view of all the evidence his decision in favor of Acme was clearly wrong. The defendant's exception to such decision, therefore, must be overruled.

In the case of Acme Aluminum Alloys, Inc. v. Pantex Manufacturing Corporation et al. all of the defendants' exceptions are overruled, and the case is remitted to the superior court for the entry of judgment on the decision.

In the case of Pantex Manufacturing Corporation v. Acme Aluminum Alloys, Inc. the plaintiff's exception is sustained, and on March 28, 1949 the defendant may appear before this court to show cause, if any it has, why the case should not be remitted to the superior court with direction to enter judgment for the plaintiff in the sum of $3049.85.

PANTEX MFG. CORP. *vs.* ACME ALUMINUM ALLOYS, INC.
HEARING ON ORDER TO SHOW CAUSE.
MAY 11, 1949.

·PER CURIAM. In the above-entitled case the defendant appeared, in response to our order to show cause why judgment should not be entered for the plaintiff in the sum of $3049.85, and claimed that on its interpretation of our opinion plaintiff should be allowed reimbursement exclusively for defective castings subject to "pinhole porosity" and that according to such interpretation judgment for the plaintiff should be only for $2578.16. Defendant makes a plausible argument in support of its claim but we are constrained to say that it is not consistent with the theory upon which we finally decided that plaintiff was entitled to $3049.85.

· We indicated in our discussion ·of the difficulty in reaching a fair and accurate figure that our conclusion was not an exact computation but rather one which reasonably approximated the evidence and did substantial justice between the parties, especially considering the peculiar circumstances surrounding their dealings in the matter of rejections. We therefore are of the opinion that defendant has not shown good cause why judgment for the plaintiff should not be entered as ordered for $3049.85.

Although, according to our practice, it is not customary for the prevailing party to be heard on a show cause rule of this nature, we permitted plaintiff to file a memorandum brief in reply to defendant's contention. Pursuant to such permission plaintiff filed a brief in which it opposed such contention and in addition thereto also sought to show that the cause should be reargued because plaintiff was entitled to judgment for the full amount of its claim. Strictly, plaintiff is not entitled to be heard in that respect as it has neither sought nor obtained permission to file a motion for reargument of the case. However, in order to end the litigation without further delay in this court we have considered the plaintiff's claim in support of a reargument and we find it to be without merit.

The case is remitted to the superior court for entry of judgment for the plaintiff in accordance with our opinion.