UNITED STATES v. COLLYER INSULAT-
ED WIRE CO. et al.
Civ. A. No. 249.

United States District Court
D. Rhode Island.
Oct. 9, 1950.

494

George F. Troy, U. S. Atty., Edward M. McEntee, Asst. U. S. Atty., Providence, R. I., William M. Lytle, John G. Roberts, Department of Justice, Washington, D. C., for plaintiff.

George Hurley, Walter V. Moriarty, Daniel H. Morrissey, Robert J. Conley, Edward W. Day, all of Providence, R. I., and Frederick Bernays Wiener, Washington, D. C., for defendants.

HARTIGAN, District Judge.

This is a civil action brought by the United States of America under and by virtue of the provisions of §§ 3490–3492 and § 5438 of the Revised Statutes of the United States, 31 U.S.C.A. §§ 231–233, to recover the forfeitures and double damages provided by § 3490 on account of certain acts alleged to have been committed by the defendants in violation of § 5438 in connection with defective manufacture and falsification of tests upon wire and cable supplied to the Army and Navy respectively, between the period from January 1, 1942 to January 18, 1943.

The pre-trial order of September 29, 1949, establishes that the damages and forfeitures involved in this action are governed by the provisions of the Revised Statutes § 3490 and § 5438, 31 U.S.C.A. § 231.

31 U.S.C.A. § 231 provides as follows:

"§ 231. *Liability of persons making false claims.*

"Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, or who, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, who, with intent to defraud the United States or willfully to conceal such money or other property, delivers or causes to be delivered, to any other person having authority to receive the same, any amount of such money or other property less than that for which he received a certificate or took a receipt, and every person authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, and every person who knowingly purchases or receives in pledge for any obligation or indebtedness from any soldier, officer, sailor, or other person called into or employed in the military or naval service any arms, equipments, ammunition, clothes, military stores, or other public property, such soldier, sailor, officer, or other person not having the lawful right to pledge or sell the same, shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit. (R.S. §§ 3490, 5438.)"

The Collyer Insulated Wire Company, hereinafter referred to as "Collyer", is a Rhode Island corporation and was engaged in the business of manufacturing wire and cable in Providence, Pawtucket and Central Falls during said period.

Clarence Vigeant, Adolf Czerniawski, Joseph Lovell, Frederick A. McManus and Frederick L. Lawton were during said period employees of Collyer and were engaged in such capacities as test operators, chief electrical engineer, superintendent and chief inspector.

None of the defendants was in the military or naval services of the United States, or in the militia called into or actually employed in the services of the United States.

On March 14, 1942, Collyer entered into a contract, designated as DA-W-2124-sc-373 (hereinafter referred to as contract 373) with the United States through the Signal Corps of the War Department, whereby the United States agreed to pay to Collyer the sum of $259,200 for the production and supply by Collyer of 9,600 miles of single-conductor wire W-110-B (concentric lay), commonly and hereinafter referred to as field wire, in 2-mile lengths, in accordance with the contract requirements and specifications.

On June 30, 1942, Collyer entered into another contract designated as W-2124-sc-3306 (hereinafter referred to as contract 3306), with the United States, also through the Signal Corps of the War Department, whereby the United States agreed to pay Collyer the sum of $169,500 for the production and supply by Collyer of 3,000 miles of twisted pair wire W-110-B (concentric lay), also referred to as field wire, in 1-mile lengths in accordance with the contract requirements and specifications.

On January 21, 1942, Collyer entered into a contract designated NOS-97222, with the United States, through the Navy Department, whereby the United States agreed to pay Collyer the sum of $644,644.80 for the production and supply by Collyer of the cable described in said contract in compliance with the contract requirements and specifications.

Exhibit 20 discloses that the Government paid Collyer on contract 373 the sum of $116,806.98; on contract 3306 the sum of $168,831.56 and on contract 97222 the sum of $671,896.84, or a total of $957,535.38.

The defendants during said period, in the performance of the aforesaid field wire and cable contracts in violation of the provisions of §§ 3490 and 5438 of the Revised Statutes, 31 U.S.C.A. § 231, for the purpose of obtaining and aiding to obtain the payment and approval of claims upon and against the United States, made, used, and caused to be made and used, false test reports and certificates knowing the same to contain fraudulent and fictitious statements and entries, and made and caused to be made and presented and caused to be presented numerous claims upon and against the United States for payment and approval for the production and supply of said field wire and cable which were known by the defendants to be false, fictitious and fraudulent.

The defendants, during the said period, in the performance of the aforesaid field wire and cable contracts, in violation of the provisions of §§ 3490 and 5438 of the Revised Statutes, agreed, combined and conspired together to defraud the United States by obtaining and aiding to obtain the payment and allowance of false, fictitious and fraudulent claims for said field wire and cable.

The defendants in a companion criminal case pleaded guilty on May 3, 1944, to Indictment No. 5636, charging them with violation of Title 18 U.S.C.A. § 88 [now § 371], and were sentenced.

The defendants, during said period, used schemes, tricks, devices and subterfuges without the knowledge of the United States, in the production of said field wire and cable and the defendants knowingly failed to comply with the contract terms and specifications in order to defraud the United States.

The United States, in reliance upon 105 false, fictitious and fraudulent vouchers, has paid Collyer $957,535.38.

Each and every one of the 105 vouchers, as shown in Exhibit 20, was a claim upon

the United States and each voucher was false, fictitious and fraudulent.

The Government argues that it is entitled to recover the sum of $2,000 for each violation of § 5438 as incorporated in § 3490 of the Revised Statutes.

The defendants argue that § 3490 does not authorize multiple forfeitures either on the reasoning of the decided cases or as an original matter of statutory construction.

It is my opinion that under the circumstances of this case each voucher is a single false, fictitious and fraudulent claim stemming from the conspiracy.

In U.S. ex rel. Marcus v. Hess, 317 U.S. 537, 552, 63 S.Ct. 379, 388, 87 L.Ed. 443, the Court said: *"Fourth.* Section 3490 requires that the $2,000 forfeit be paid for doing 'any' of the acts prohibited by § 5438. Before the District Court, petitioner contended that this sum should be exacted for every form submitted by respondents in the course of their enterprise, while respondents argued that there should be merely one $2,000 sum collected for all the acts done. The district court concluded that the lump sum in damages should be assessed for each separate P.W.A. project. Petitioner does not object to this decision and we conclude that under the circumstances of this case each project can properly be counted separately. The incidence of the fraud on each additional project is as clearly individualized as is the theft of mail from separate bags in a post office, Ebeling v. Morgan, 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151; and see Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306. Cf. Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489. Under respondents' view the lump sum to be paid would be about $30.00 a project; and we cannot suppose that Congress meant thus to reduce the damages recoverable for respondents' fraud and thereby allow them to spread the burden progressively thinner over projects each of which individually increased their profit."

■ The Supreme Court in the Hess case did not pass on the question that confronts us here as to whether or not one forfeiture is recoverable for each voucher, but that multiple forfeitures are recoverable is inherent in that decision. It is clear that the Court did not hold for the respondents' contention "that there should be merely one $2,000 sum collected for all the acts done."

The circumstances of each case are to be considered and here each voucher can be regarded and counted separately as "a claim" within the meaning of the statute, as I understand the Hess case.

Section 3490 uses the word "any" in regard to the various acts prohibited by § 5438. In the circumstances here, if the contentions of the defendants were accepted, it would be a mockery against the intent of the statute to allow the defendants to lump all their derelictions and fraudulent practices under one or the other of the three contracts.

To allow the defendants to escape the statutory liability for their fraudulent acts during the period of the conspiracy by the mere payment of one forfeiture of $2,000 or three forfeitures totalling $6,000, seems unrealistic to me when we are dealing with payments made by the Government on 105 distinct fraudulent claims amounting to nearly $1,000,000.

The evidence discloses that some of the field wire and cable delivered was not in accordance with the minimum specifications but was palmed off by the defendants by the use of various means and tricks such as switching of tags, seals and labels; using concealed switches to misrepresent the tests required; failing to submerge certain of the wire for a particular period; skipping reels and otherwise delivering, making claims for, and receiving payment for uninspected inferior and untested field wire and cable below specifications.

The fraudulent practices of the defendants made it impossible to distinguish satisfactory wire and cable from that which was inferior; and, in this way, these fraudulent practices tainted each voucher so that each separate voucher constituted a false claim.

The fraud permeates the three contracts during the whole period involved here and taints each one of the 105 vouchers. Each

voucher was a distinct claim that individually increased Collyer's profits. See U. S. ex rel. Marcus v. Hess, supra.

No officer of Collyer took the witness stand, nor did Czerniawski or Lovell, to deny the overwhelming evidence produced by the Government of the conduct of the defendants complained of in the instant case.

In United States v. Grannis, 4 Cir., 172 F.2d 507, 512, 514, the Court said:

"* * * The jury might well have been told that the failure to testify on the part of business men charged with defrauding the government in a time of national emergency, where the facts were peculiarly within their knowledge, might fairly give rise to the inference that the defendants believed that if they appeared upon the stand and subjected themselves to cross examination, their testimony would be damaging to their case. Plunkett v. Levengston, 7 Cir., 258 F. 889; Adamson v. California, 332 U.S. 46, 56, 67 S.Ct. 1672, 91 L. Ed. 1903, 171 A.L.R. 1223; Wigmore on Evidence, 3d Ed. 1940, § 289.

\* \* \* \* \* \*

"The unfavorable inferences against the defendants, which are justified by these facts, are fortified beyond all reasonable doubt by the failure of the defendants either to testify themselves or to offer any testimony on their own behalf."

Collyer, by one of its officers, stated on each invoice submitted to the Government, the following: "I certify that the above bill is correct and just; * * *."

As a result of such certification by defendant Collyer on its invoices, and the receipt by the respective Army and Navy field certifying officers of reports and certifications from their inspectors that the material had been properly inspected and approved, the said Army and Navy field officers prepared vouchers or claims to be submitted to the Army and Navy Departments for payment, and stated thereon, over their signatures, that: "Pursuant to authority vested in me, I certify that the above articles were received in good condition, after due inspection, acceptance, and delivery prior to payment as required

by law * * * and were necessary for the public service; and that the prices charged are just and reasonable and in accordance with the agreement."

In addition to the foregoing, the Army field officers were caused, by the defendants' false schemes, tricks, devices and subterfuges, to certify to the Army disbursing officers as follows: "I certify that I personally inspected the articles listed above; that the quantities thereof given in column 'Quantity This Inspection—Accepted' have been accepted as conforming to contract requirements; that the accepted material, which is now the property of the United States, has been shipped or is being prepared and marked for shipment as indicated on the reverse side hereof; * * *" and the Navy field officers were caused, by defendants' false tricks, schemes and devices, to certify to Navy disbursing officers as follows:

"I certify that the above described material has been inspected as to quality and is in accordance with the requirements of the order or contract (except as noted)."

"Test results satisfactory. Material accepted and shipment authorized under US N stamp. Originally stamped USN pending results of analysis or test."

As a result of the submission of the 105 vouchers, each of which was based on various fraudulent supporting papers, checks were issued by the Government, payable to Collyer, averaging about $9,120 each.

The defendants attempt to analyze the intent of Congress in the enactment of § 3490. They argue that the statute authorizes only one forfeiture per suit and that it is clear from other contemporaneous legislation imposing penalties and forfeitures that it was not intended to impose multiple forfeitures. Defendants refer to the fact that the word "forfeiture" is in the singular; that the bail provision was limited to $2,000 and that the same Congress which passed said statute enacted other statutes which, unlike § 3490, provided for multiple forfeitures. These arguments do not appeal to me.

Multiple forfeitures have been imposed in U.S. ex rel. Marcus v. Hess, 317 U.S.

537, 63 S.Ct. 379, 87 L.Ed. 443; rehearing denied 318 U.S. 799, 63 S.Ct. 756, 87 L.Ed. 1163; United States v. Rohleder, 3 Cir., 157 F.2d 126; United States v. Grannis, 4 Cir., 172 F.2d 507, certiorari denied 337 U.S. 918, 69 S.Ct. 1160, 93 L.Ed. 1727 and United States v. Gardner, D.C., 73 F.Supp. 644.

The statute provides, in addition to the forfeiture clause, for the payment of "double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit."

The question involving damages as distinguished from forfeitures in this case is a difficult one especially in view of the fact that the evidence does not disclose that any of the Army field wire or Navy cable was ever returned to Collyer.

The Government admits that all of the field wire referred to in paragraph 6 of the complaint was "manufactured, produced and delivered by Collyer to the plaintiff's Signal Corps, under contract No. DA-W-2124-sc-373, was furnished, shipped and delivered to the United Kingdom as it fully appears in answer to interrogatory No. 18, and the plaintiff has no information, record or knowledge as to the ultimate use or destination of such field wire, and no complaints as to quality have been received by the plaintiff."

The Government also admits as to contract No. W-2124-sc-3306, wire shipped to the Marine Corps, that it received no complaints as to the quality of said wire.

The Government further admits that some of the cable received from Collyer under contract NOS-97222 was issued for installation on some ships for the Navy and for some foreign governments and that there were no complaints relative to the cable. In its argument the Government stated: "A lot of it that went out was good wire."

The facts force the conclusion that all the wire and cable were not worthless. They have value at least to the defendants and none was ever returned nor was there any offer of return made by the plaintiff,

even of the 204 non-conforming reels tested at Barstow. It is not at all clear from the evidence that all the wire and cable were worthless even to the Government. The contract provision allowing purchase below specifications indicates that non-conforming wire might have some value. The reels alone appear to be worth more than $30,000.

The fair inference on all the evidence is that the wire and cable were of some value and that some was used.

In U. S. ex rel. Marcus v. Hess, supra, the Court said, 317 U.S. at page 550, 63 S. Ct. at page 387: "* * * As to the double damage provision, it can not be said that there is any recovery in excess of actual loss for the government, since in the nature of the qui tam action the government's half of the double damages is the amount of actual damages proved. * * *"

■ It is my opinion that the Government is entitled to a judgment, under the double damages provision of the statute, in an amount which reflects only the actually defective or inferior wire and cable delivered to the Government.

In June, 1943, 995 reels of field wire were found in a storage depot in the Marine Base at Barstow, California. The Government made tests on about 400 reels of wire and 204 reels or 51% were found not to meet the specifications. There is no evidence that similar tests were made on the Navy cable. On the basis of these tests the Government argues that it is entitled to recovery of damages for 51% of all the field wire and cable purchased.

The Government's assumption that 51% of all the field wire and cable was defective because 51% tested at Barstow was below specifications is an assumption that I do not agree with in assessing damages here. See Acme Aluminum Alloys v. Pantex Mfg. Corporation, R.I., 64 A.2d 868.

In Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652, the Court said: "In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based

on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. * * *"

Any assessment of substantial damages in the case at bar, on the evidence before me, would be speculation and guesswork.

The Barstow test was concerned only with Army field wire. The contract payments for the same amounted to $285,000 or less than 1/3 of the total payments made on all three contracts. I do not think that the 51% figure obtained from the Barstow tests should be projected into all the contracts, especially when the Navy cable, which amounted to over 2/3 of the total of all three contracts, was not tested by the Government.

The testimony of Government witnesses, relative to how much wire and cable were not properly tested, amounts to hardly more than speculations and guesses.

Though their testimony was important as to the conspiracy, yet it was too speculative in character to use as a means of discovering how much field wire and cable not conforming to specifications were shipped to the Government. Nor should the 51% figure be applied in connection with ascertaining how much Army field wire did not conform to the specifications, though it too has corroborative value as to the conspiracy.

In Reading Steel Casting Co. v. U. S., 268 U.S. 186, 188, 45 S.Ct. 469, 470, 69 L.Ed. 907, the Court said: "* * * The contract is to be construed and the rights of the parties are to be determined by the application of the same principles as if the contract were between individuals. Smoot's Case, 15 Wall. 36, 47, 21 L.Ed. 107; [Amoskeag] Manufacturing Company v. United States, 17 Wall. 592, 595, 21 L.Ed. 715; United States v. Smith, 94 U.S. 214, 217, 24 L.Ed. 115."

In Priebe & Sons v. United States, 332 U.S. 407, 411, 413, 414, 68 S.Ct. 123, 125, 92 L.Ed. 32, the Court said:

"It is customary, where Congress has not adopted a different standard, to apply to the construction of government contracts the principles of general contract law.

United States v. Standard Rice Co., 323 U.S. 106, 111, 65 S.Ct. 145, 147, 89 L.Ed. 104, and cases cited. * * *

"* * * The rule which they announce has been applied both to the exigencies of war (United States v. Bethlehem Steel Co., supra [205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731]) and of peace (Wise v. United States, supra [249 U.S. 361, 39 S.Ct. 303, 63 L. Ed. 647]). * * *."

It is my opinion that the forfeiture provision of the statute is peculiarly applicable to the circumstances of this case. It affords the Government at least a degree of relief for fraudulent practices where a specific amount of actual damages cannot be proved.

It is my opinion that substantial justice will be done in the circumstances here by allowing the Government to recover $2,000 on each of the 105 false claims, amounting to $210,000, and double nominal damages.

Nominal damages are assessed at $1 each on contracts 373 and 97222 and $204 on 3306 ($1 on each of the 204 non-conforming reels tested at Barstow), which doubled amounts to $412.

Judgment, accordingly, will be entered for the Government for $210,412 against the defendants jointly and severally, together with the costs of suit.