**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Richard K. EHRLICH and Lurline Gardens Limited Dividend Housing Partnership, Defendants-Appellants.**

No. 79–3304.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 4, 1981.
Decided April 23, 1981.

Sanford R. Demain, Van Nuys, Cal., argued, for defendants-appellants; Martha Goldin, Goldin & Goldin, Hollywood, Cal., on brief.

William S. Freeman, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Appeal from the United States District Court for the Central District of California.

Before WRIGHT and CANBY, Circuit Judges, and MURPHY, Senior District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

## I. FACTS

Section 236 of the National Housing Act, 12 U.S.C. § 1715z–1 (1976), authorizes the Secretary of Housing and Urban Development to insure mortgages and subsidize interest payments on behalf of the sponsors of low income housing projects. This case involves a project sponsored by Lurline Gardens, a limited partnership. Richard Ehrlich was Lurline's sole general partner, and was the general contractor for the project.

An insurable mortgage is limited, in a case such as this, to 90% of the replacement costs of the project. Replacement costs include construction costs.

The interest subsidy reduces the sponsor's interest payments to one percent of the amount of the mortgage and the larger the mortgage, the larger the subsidy.

HUD initially estimates the construction and other costs of a project to determine the maximum insurable mortgage. Upon completion of the project, the sponsor must submit a statement of actual costs to HUD. If the costs are less than estimated, the insurable mortgage is reduced, and the sponsor must repay a portion of the principal to the mortgagee.

Interest subsidies are paid directly to the mortgagee who submits a monthly voucher to HUD. It lists all mortgages held by him for which HUD has agreed to provide interest subsidies, and certifies that none is in default.

* Of the Southern District of New York.

HUD, Lurline Gardens, and a mortgagee entered into an "Agreement and Certification" in August 1971. Ehrlich signed the agreement on behalf of the partnership. HUD agreed to insure the mortgage and provide interest subsidies. The partnership

> agree[d] that if it receives from the Mortgagee monies in excess of that permitted under the National Housing Act and the Regulations promulgated pursuant thereto, it will pay upon demand forthwith to the Mortgagee any such excess for application to the reduction of the then outstanding principal balance of the mortgage.

The Agreement recites that, other than Ehrlich's role as general contractor, there was no identity of interest between the partnership, the general contractor, and the subcontractors. The partnership agreed to notify HUD of any identity of interest that was created. In that event, the Agreement provided:

> For purposes of determining actual cost no profit or general overhead may be included in the subcontract unless [HUD] has in advance granted approval in writing of the subcontract and has approved a specific dollar amount or a specific percentage for profit and/or general overhead.

In August, 1972, the partnership submitted a Mortgagor's Certificate of Actual Cost, and a Contractor's Certificate of Actual Cost, both prepared by Ehrlich. The certificates overstated construction costs so that the partnership would not have to repay a portion of the principal. HUD was then insuring a larger mortgage and providing larger interest subsidies than were authorized under the Act.

Ehrlich also certified falsely that there was no identity of interest with any subcontractor on the project. He was the sole owner of one subcontractor, Topaz Supply Corporation.

In 1975, Ehrlich pleaded guilty to two counts of an indictment, based on these events, charging him with submitting false statements to a government agency. He admitted knowingly and intentionally inflating the costs of construction.

In April, 1978, HUD demanded that the partnership pay the excess principal to the mortgagee pursuant to the Agreement. The partnership did not comply.

HUD then initiated this action and obtained a summary judgment. The district court ordered specific performance of the Agreement, directed the partnership to reduce the principal on the mortgage, and assessed 76 forfeitures and double damages under the False Claims Act, Rev.Stat. §§ 3490, 3494 & 5438.

We affirm.

## II. SPECIFIC PERFORMANCE

The district court directed the partnership to reduce the principal by $227,700. Ehrlich argues that summary judgment was inappropriate because there is a dispute as to the actual cost of the project, which is used to calculate the amount of the reduction. He also argues that HUD lacks standing and its action is barred by a statute of limitations.

The district court relied on an affidavit by William Willits, a HUD official, which set forth in detail HUD's calculation of the actual cost of the project.

In his brief, Ehrlich objects to two aspects of this calculation. First, no markup was allowed on materials purchased from Topaz Supply Corporation. At oral argument, however, his counsel conceded that Ehrlich's failure to disclose his identity of interest and obtain advance approval of the markup permitted HUD, under the express terms of the Agreement, to exclude it from actual costs.

■ Second, Ehrlich claims that a group of items identified as "Other Costs" is understated. He submitted an affidavit alleging that when the mortgage was first issued, "Other Costs" were $70,000 more than the figure Willits used. He did not specify any items that were omitted or understated, but simply alleged he did not understand the calculation.

This does not defeat a motion for summary judgment. An exhibit to Willits' affidavit set forth the specific items included in "Other Costs." Ehrlich did not seek a continuance or use discovery procedures for additional information regarding the calculation. "Conclusory allegations, unsupported by factual data, do not create a triable issue of fact." *California ex rel. Department of Transportation v. United States ex rel. Department of Transportation, Federal Highway Administration*, 561 F.2d 731, 733 n.4 (9th Cir. 1977) (citations omitted).

█ We see no merit to the argument that HUD lacked standing to enforce the partnership's obligation to reduce the principal. HUD was a party to the Agreement, and the provision requiring reduction of the mortgage was for its benefit.

█ Nor is there merit to the argument that relief was barred by the statute of limitations. Ehrlich claims 28 U.S.C. § 2415(b) (1976) is applicable. It imposes a three-year limit on tort actions. Here, the substance of the claim sounds in contract, and if any limitations period applies,[1] it is six-years. 28 U.S.C. § 2415(a) (1976). *See United States v. Limbs*, 524 F.2d 799, 801 (9th Cir. 1975). The action was timely brought.

### III. FALSE CLAIMS ACT

A person who "present[s] or cause[s] to be presented" a claim against the United States, "knowing such claim to be false, fictitious, or fraudulent," is subject to civil liability under the False Claims Act. Rev. Stat. §§ 3490, 3494 & 5438. *See United States v. Bornstein*, 423 U.S. 303, 305 n.1, 96 S.Ct. 523, 526 n.1, 46 L.Ed.2d 514 (1976). The district court held that Ehrlich caused false claims to be presented.

The monthly vouchers of the mortgagee were false claims within the meaning of the Act. The concept of a claim against the government includes a demand for money.

1. 28 U.S.C. § 2415(a) (1976) applies to an action by the United States for money damages. Because the action was filed within the six-year

*Id.* at 309 n.4, 96 S.Ct. at 528 n.4. Due to Ehrlich's false certifications, the interest subsidies demanded and paid each month were falsely inflated. Individual demands for payment pursuant to one overall contract constitute individual false claims. *United States v. Woodbury*, 359 F.2d 370, 377–78 (9th Cir. 1966); *United States v. Collyer Insulated Wire Co.*, 94 F.Supp. 493, 496 (D.R.I. 1950).

Two civil penalties may be assessed under the Act. Any person who "shall do or commit any of the acts prohibited ... shall forfeit and pay to the United States the sum of two thousand dollars ...." Rev. Stat. § 3490. In addition, the person is liable for double the damages sustained by the United States "by reason of" such acts. *Id.*

### A. Forfeitures

█ The district court assessed 76 forfeitures, one for each monthly voucher. Ehrlich argues the number of forfeitures should be limited to the number of acts he committed which caused false claims to be filed. Asserting that he did but one act, inflating construction costs, that caused false claims to be filed, he concludes that he is liable only for one forfeiture.

HUD argues the number of false claims was the proper measure of the number of forfeitures. It emphasizes that Ehrlich knew false claims would be filed each month, and that he could have prevented additional false claims from being filed by reducing the principal on the mortgage. By not doing so, he reaped a continuing benefit at the government's expense.

In *Bornstein*, the Court considered a similar question. A subcontractor sent, in three separately invoiced shipments, falsely labelled components to a prime contractor. The prime contractor shipped the final product to the government in 35 separately invoiced shipments. Each invoice was a false claim within the meaning of the Act.

period, we need not decide whether the statute applies to an action for specific performance.

The Court held that the subcontractor was liable for three forfeitures. "A correct application of the statutory language requires ... that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." 423 U.S. at 313, 96 S.Ct. at 529. Had the subcontractor committed one act which caused false claims to be filed, it would have been liable only for one forfeiture, regardless of the number of claims filed. *Id.* at 312, 96 S.Ct. at 529.

The Court noted, however, that the number of false claims submitted by the prime contractor was unrelated to the subcontractor's conduct. "The fact that [the prime contractor] chose to submit 35 false claims instead of some other number was, so far as [the subcontractor] was concerned, wholly irrelevant—completely fortuitous and beyond [its] knowledge or control." *Id.* at 312, 96 S.Ct. at 529.

This strongly suggests that, if a person knowingly causes a specific number of false claims to be filed, he is liable for an equal number of forfeitures. In the absence of such knowledge, using the number of claims to determine the number of forfeitures would be arbitrary. Where such knowledge is present, however, it is consistent with the purposes of the Act to impose forfeitures based on the number of claims.

The Act's sponsor said it was aimed at "bands of conspirators" who were defrauding the government. Cong.Globe, 37th Cong., 3d Sess., 955 (remarks of Sen. Howard). It would defeat the purposes of the Act to impose multiple forfeitures on a person submitting false claims, but limit the liability of coconspirators who caused the claims to be submitted.

This case is analogous. Ehrlich knew a false claim would be submitted each month. He could have prevented the filing of additional false claims. Instead, he did nothing and gained a continuing benefit from the inflated interest subsidies. Had he submitted the claims himself, he would be liable for 76 forfeitures. As in the case of conspirators, it would defeat the purposes of the Act, given Ehrlich's knowledge and control of the situation, to limit his liability to one forfeiture.

The district court correctly held him liable for 76 forfeitures.

#### B. *Double Damages*

Ehrlich argues that the district court erred in granting summary judgment of double damages under the False Claims Act. The damage award is based on the excess interest subsidies paid by HUD.

■ The excess payments resulted from the falsification of construction costs. The damage calculation begins, therefore, with a determination of the amount by which Ehrlich falsely overstated those costs. Ehrlich argues that it is improper to include the "Topaz markup" in the amount of the overstatement, since he lacked fraudulent intent when he included it in the statement of actual costs.

The government's burden was to prove that Ehrlich caused false claims to be filed with knowledge that the claims were false. *United States v. Mead,* 426 F.2d 118, 123 (9th Cir. 1970). It had to show that Ehrlich knew the Topaz markup could not be included in actual costs.

On three occasions Ehrlich disclaimed in writing any identity of interest between the prime and subcontractors. He has admitted he knew these disclaimers were false. He cannot now deny such knowledge. F.R. Civ.P. 36(b).

The Agreement expressly excludes profit or general overhead from actual cost where there is an identity of interest, absent prior approval by HUD. Ehrlich signed the Agreement and is fairly charged with knowledge of its provisions. Coupled with his admission that he was aware of the identity of interest, this is sufficient to establish that he knew the markup could not be included in actual costs.

Ehrlich's affidavit stated he did not refuse to declare his interest in Topaz. He did not allege that he was unaware of this provision, however, or that he was unaware

of the identity of interest. His affidavit does not establish a material dispute regarding his knowledge that the markup could not be included in actual costs.

▪ Ehrlich also argues that "early on" HUD was aware that the cost figures had been falsely inflated. He claims that from that time forward no damages were sustained "by reason of" his acts.

HUD demanded that the partnership reduce the principal in 1978. It refused. Had HUD acted unilaterally and terminated the excess interest subsidies, it would have risked contractual liability to the mortgagee, and the possibility of a default on the mortgage. In that event, as an insurer, it would have been liable for the outstanding balance.

Under the circumstances, we cannot conclude that HUD's knowledge that Ehrlich had overstated costs broke the chain of causation. It continued to incur losses "by reason of" Ehrlich's fraudulent acts.[2]

Finally, Ehrlich argues that he paid HUD excess rental charges, and that some of these payments were used by HUD for its interest subsidy payments. He would have the damages suffered by reason of the excess interest subsidies reduced by the amount of these excess rental payments.

▪ Ehrlich was required by statute to make these payments. 12 U.S.C. § 1715z–1(g) (1976). Compliance with a statutory duty is no basis to reduce the damages.

AFFIRMED.

CANBY, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the opinion of Judge Wright except Part III, subdivision A. With that portion of the opinion, which affirms the imposition of 76 forfeitures, I respectfully dissent. My reading of *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), compels me to conclude that appellant is liable for no more than two forfeitures under Rev.Stat. §§ 5438 and 3490.

It is true, as the majority opinion points out, that in *Bornstein* the subcontractor that caused the prime contractor to submit 35 false claims had no knowledge or control over the number of separate claims the prime contractor chose to submit. In my view, however, this point is not the essential part of *Bornstein*. The central point is found in *Bornstein's* rejection of the Government's argument that the subcontractor should be held liable for 35 forfeitures:

> The difficulty with this position is that it fails to distinguish between the acts committed by Model [the subcontractor] and the acts committed by United [the prime contractor]. The distinction is a critical one, because the statute imposes liability only for the commission of *acts* which cause false claims to be presented.

423 U.S. at 312, 96 S.Ct. at 529 (emphasis supplied). The Supreme Court's position is made even more clear by the language immediately following:

> If United had committed one act which caused Model to file a false claim, it would clearly be liable for a single forfeiture. If, as a result of the same act by United, Model had filed three false claims, United would still have committed only one act that caused the filing of false claims and thus, under the language of the statute, would again be liable for only one forfeiture. If, on the other hand, United had committed three separate such causative acts, United would be liable for three forfeitures, even if Model had filed only one false claim. *The Act, in short, penalizes a person for his own acts, not for the acts of someone else.*

*Id.* (Emphasis supplied).

In my view, the majority here deviates from the teaching of *Bornstein* by subjecting the appellant to forfeitures based not upon his own causative acts, but upon the

---

2. *Cf. United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977) (defendant not liable under False Claims Act because loss attributable to the wrongdoing of a third party); *United States v.* *Fox Lake State Bank*, 366 F.2d 962 (7th Cir. 1966) (defendant not liable because government invited claim as a means of adjudicating its merits).

76 submissions by the mortgagees. Indeed, the majority's analogy to the law of conspiracy indicates that appellant is being charged with responsibility for the mortgagee's filings. This is what the quoted language of *Bornstein* instructs us not to do.

It appears from the findings and conclusions of the district court that appellant submitted two documents that falsely inflated the cost of construction: the Mortgagor's Certificate of Cost prepared by appellant on behalf of his partnership, and the Contractor's Certificate of Cost prepared by him as general contractor. I would accordingly hold appellant liable for two forfeitures.