**UNITED STATES v. GRANNIS et al.**

No. 5799.

United States Court of Appeals
Fourth Circuit.

Feb. 3, 1949.

508

lina, in 1940 and 1941. The gist of these sections is that any person not in the military or naval forces of the United States, who shall make or cause to be made or presented for payment or approval to or by any person or officer in the civil, military or naval service of the United States, any claim against the United States, knowing the claim to be false, fictitious or fraudulent, or who, for the purpose of obtaining the payment or approval of such claim, makes or causes to be made or used any false bill, receipt, voucher or certificate, knowing the same to contain any fraudulent or fictitious statement, shall forfeit and pay to the United States the sum of $2,000, and in addition, double the amount of damages which the United States may have sustained by reason of the doing of the act, together with the costs of suit.

Grannis, together with three other joint adventurers not party to this suit, entered into a contract with the United States for the construction of an antiaircraft firing center known as Camp Davis, on a cost plus a fixed fee basis.

Sloan was the office manager of Grannis and subject to his control.

Jones was a brother-in-law of Grannis, and became the lay figure over whom the fictitious transactions were draped in order to give them the appearance of reality.

The agreement provided that for the performance of the work the contractor should receive reimbursement for his expenditures, rental for his equipment, and a fixed fee of $270,942. The fixed fee was to constitute complete compensation for the contractor's services, including profit and overhead expenses.

The contractor was required to keep accurate records and books of account, to take all cash and trade discounts and rebates, and to account for and apply them in reduction of the cost of the work. In addition the contractor agreed at all times to use his best efforts in all acts under the contract to protect and subserve the interest of the government.

It was agreed that rental for equipment owned by the contractor should be based on actual cost for new equipment and replace-

J. Gregory Bruce, Atty., Dept. of Justice, of Washington, D. C. (H. G. Morison, Asst. Atty. Gen., John H. Manning, U. S. Atty., of Raleigh, N. C., Howard H. Hubbard, Asst. U. S. Atty., of Clinton, N. C., Joseph M. Friedman, Sp. Asst. to Atty. Gen. and William M. Lytle, Atty., Department of Justice, of Washington, D. C., on the brief), for appellant.

Horace E. Stacy, of Lumberton, N. C., and L. P. McLendon, of Greensboro, N. C. (J. R. Nance and R. H. Dye, both of Fayetteville, on the brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This suit was instituted by the United States against Edward Grannis, Karl Sloan and William R. Jones to recover forfeitures and damages specified by R.S. § 3490, 31 U.S.C.A. § 231, on account of certain acts committed by the defendants in violation of R.S. § 5438 [1] during the construction of Camp Davis at Wilmington, North Caro-

---

[1] In 1948 Criminal Code, see 18 U.S.C.A. §§ 286, 287, 1001.

ment cost new for used equipment; that the contractor was to submit a fair valuation thereof at the time of its arrival at the site of the work, subject to the approval of the contracting officer of the United States; and that when the total rental paid should equal the fair valuation, plus 1 per cent. per month during the use of the equipment, no further rental should be paid and title thereto should vest in the government. The government's rental schedule for equipment owned by the contractor allowed the contractor reimbursement for depreciation, taxes, insurance, storage and interest on the investment, but excluded profit.

Rental actually paid by the contractor for equipment owned by third parties was allowed as an expenditure and was to be covered by contract between the contractor and the third parties in the form prescribed by the government, subject to the approval of the contracting officer, and was to contain provisions entitling the government to acquire title in the same manner as was provided with regard to equipment owned by the contractor; but the rental for equipment owned by third parties was to be fixed at a figure which included a profit to the owner, and third parties were not required to account to the United States for rebates received by them in the purchase of equipment. Hence the amount allowed the contractor for the rental of third party equipment exceeded the rental allowed him for his own equipment. These circumstances made it possible for the defendants to present the fictitious claims in this case.

The work under contract began December 10, 1940, and ended May 28, 1942. In December, 1940 and January, 1941, 130 automobile trucks and cars were entered on the rolls in Jones' name; on December 23, 1940 a rental agreement for this equipment was executed in the name of Jones and the joint adventurers; and on February 3, 1941, this agreement was approved by the constructing quartermaster of the government. A separate schedule for each of the cars, initialed by Jones and the government representative, was attached to the agreement. The first 80 items were on schedules which set out a description of the vehicle, the rental per day, and the value of the item. The remaining 50 items were on schedules which not only contained information in these respects, but also specified the cost new of the item. The figure for cost new and present value set out as to these 50 items were in each instance identical.

At the time of these transactions, Jones was a road superintendent for the T. A. Loving Company which had a government construction contract at Fort Bragg, North Carolina. He was not in the automobile business and did not own any automobile trucks or cars. He had neither the financial ability nor credit at the banks to enable him to purchase the equipment rented in his name to the contractor. Sloan arranged with two banks at Fayetteville, North Carolina, for loans to be made in the name of W. R. Jones and carried on the bank's books in the name of "W. R. Jones by K. Sloan". A total of $77,091.37 was borrowed in this way and Grannis guaranteed the payment of the loans. In addition he deposited $20,000 in one of the banks in the "W. R. Jones by K. Sloan" account. These sums were used in the purchase of the cars and trucks above described. Checks for the rental of the equipment were issued by the contractors and forwarded to Jones addressed to the post office box of Grannis, and came into the possession of Sloan who deposited them in the banks.

Jones had nothing to do with negotiating the loans, except that he signed the notes and chattel mortgages on the equipment which were given to the banks. Nor did he have authority to withdraw funds from the bank accounts. He signed only two checks, one for $3200 to the Collector of Internal Revenue in payment of his income tax, and one for $1,397.96 for insurance on the trucks. The records of the banks show that only Sloan was authorized to sign the checks. These records do not show that any funds from these accounts were paid to either Grannis or Sloan. The disbursements included payments to the automobile dealers for the purchased cars and payments to the banks in return for the money loaned. The disbursements also included the sum of approximately $30,000 made to an automobile dealer on account of an obligation due him for automobiles bought by a nephew of Grannis. This sum was ultimately repaid Jones by the nephew,

and constitutes the greater part of the gains derived from the rental of the trucks to the contractors in the name of Jones.

The following circumstances attending the acquisition of the 130 vehicles disclose the identity of the parties actually concerned and the participation of the individual defendants. Grannis arranged for the purchase of 25 used Chevrolet trucks in December, 1940. A Chevrolet dealer at Fayetteville received an inquiry for new trucks from Grannis' office at Wilmington, and later offered him 25 used trucks. Grannis came from Wilmington to Fayetteville with two army officers, inspected the trucks, and ordered them delivered to Camp Davis. When they were delivered Sloan instructed the dealer to invoice them to Jones, and title was taken in Jones' name. Payment was made by checks signed "W. R. Jones by K. Sloan". Jones took no part whatever in the negotiations for the purchase of these trucks.

During January and February, 1941, 54 Ford trucks and automobiles were purchased by Grannis from another dealer and placed on the rental rolls at Camp Davis under the Jones rental agreement. The negotiations for the purchase were made by Grannis or Sloan. The invoices were made out in the name of Grannis and paid for out of the "W. R. Jones by K. Sloan" account. Titles for the vehicles were obtained in the name of Jones. Since Grannis was a fleet owner and purchaser of Ford automobiles, he was given a discount from the retail price. Three-quarter ton trucks were invoiced to Grannis at $575 each, but were placed on the Jones rental schedule at $792 each. Four door DeLuxe Sedans were invoiced to Grannis at $736.50 each and placed on the Jones rental schedule at $951. In addition Grannis obtained discounts on these cars from the dealer by certifying that he was the purchaser and owner of the cars, and agreeing not to resell the cars except after bona fide use and except to salaried employees. The total amount of the additional discounts thus obtained on these 54 cars and upon 17 cars purchased from another dealer, and 6 cars purchased from a third dealer, hereinbefore referred to, 77 cars in all, was $1,541.

In February, 1941, Grannis or Sloan bought over the telephone 5 Ford pick-up trucks and 1 station wagon. Grannis was given a discount from the regular retail list price. The invoices were issued in the names of Jones and showed a sales price of $560 for each of the 5 trucks, and $848 for the station wagon. The trucks were listed on the Jones rental schedules at $792 each, and the station wagon at $1,207. Payment for the cars was by check on the "W. R. Jones by K. Sloan" account.

In January and February, 1941, another dealer made a sale of 17 Ford cars and trucks, which were shown on his books as made to W. R. Jones, with a notation to charge Grannis. The invoices showed a sale price of $567.50 for each of the Ford trucks and $737.85 for the Sedans. The Jones rental schedules showed that the cost new of these vehicles was $792 for each of the trucks and $990 for the sedans in December, 1940.

In January, 1941, Sloan, acting for Grannis, negotiated for the purchase of 28 new Plymouth cars, and after the delivery of the first of these cars to Camp Davis, Sloan instructed the dealer to invoice the cars in the name of Jones and payment was made by check signed "W. R. Jones by K. Sloan". The invoice showed the sales price on 4-door Sedans at $742.95 each while the Jones rental schedules showed a cost new and present value of $951.

All of the 130 cars and trucks, except 5, were taken over by the government in accordance with the provisions of the contract at the value listed on the Jones rental schedules, plus 1 per cent. per month during their use. Claims for reimbursement, or payment of the rentals upon recapture of the cars and trucks were presented to the government in ten vouchers, and payment of these claims was made by the government. On the 125 cars taken over by the United States, the government paid $28,914.71 more than it would have paid if the cars had been placed on the rental schedules as the property of Grannis at valuations based upon the actual cost to him. In addition the government alleges that it paid on the 5 cars not taken over

by it overcharges of rental in the sum of $2,031. The government claims damages in the sum of these overcharges, and in addition, the sum of $1,541, which Grannis received as rebate from the Ford Motor Company but failed to account for to the United States as required by the contract, or a total of $32,486.71 [2] The government also claims under R. S. § 3490 the sum of $2,000 for each of the false, fraudulent and fictitious claims made by the defendants against the United States.

At the conclusion of the government's case the defendants made a motion for a directed verdict which the court denied. They then announced that they would offer no evidence, whereupon the government made a motion for a directed verdict, which was also denied. The case was then submitted to the jury upon issues which required them to answer questions to the following effect:

1. Did the defendants, or any two of them, enter into any agreement, combination or conspiracy to defraud the United States by falsely representing the equipment rented in the name of Jones to be his property when in truth the equipment belonged to Grannis?

2. If so, which defendants entered into the agreement, combination or conspiracy?

3. Did any defendant who so conspired make a false or fraudulent claim against the United States knowing it to be false?

4. Did any such defendant for the purpose of obtaining payment of such claim make any false bill, voucher or certification knowing it to contain a fraudulent or fictitious statement of entry?

The jury found by their verdict that no two defendants had conspired to defraud the United States, and this put an end to the case, for the judge had instructed the jury that if they did not find such a con-

spiracy, there would be no evidence upon which to base the charge that the claims were fraudulent. The explanation of this verdict, which was surprising in view of the failure of the defendants to testify themselves or to offer any explanation of their conduct, may perhaps be found in certain incidents of the trial. In the state courts of North Carolina opening statements by counsel for the parties to the jury at the beginning of a trial are not made but instead the pleadings of the parties are read to the jury. The defendants' answer in the pending case set out the special defense that the government's suit was barred because the defendants had been charged with a conspiracy to defraud the United States in violation of 18 U.S. C.A. § 88 [now § 371], and had been acquitted in the court below on July 10, 1944, under an indictment based on the identical matters involved in the instant suit. After the jury had been sworn, but before any evidence was taken, the government filed a motion to dismiss this portion of the defendants' answer for the reason that it did not state a legal defense to the suit. The government also objected to the reading of this portion of the answer to the jury. These proceedings took place outside the presence of the jury, but the judge denied both the motion and the objection.

It is clearly established that the defense of double jeopardy is not applicable in civil actions under the federal false claims statute, United States ex rel. Marcus v. Hess, 317 U.S. 537, 548, 552, 63 S.Ct. 379, 87 L.Ed. 443; United States ex rel. Ostrager v. New Orleans Chapter, &c., 317 U.S. 562, 63 S.Ct. 393, 87 L.Ed. 458. The judge himself held this view of the law but nevertheless permitted the jury to be told of the acquittal of the defendants in the criminal case. He attempted to cure the prejudicial effect of this action by tell-

---

[2] The government's figure of $2,031 for overcharge on rental of unrecaptured items is too high by $131.68. The government calculated the amount of the overcharge by subtracting from rent actually paid the rent allowable under the formula specified in the government's schedule for contractor-owned equipment. But the government's figures for allowable rent failed to include 1 per cent. of the estimated present or actual value for each month the equipment was rented. See column 7 of the "white schedule" and paragraph 13 of the Administrative Instructions Relating to Procedure for Machinery Rental on Cost Plus A Fixed Fee Contracts, issued by the Office of Quartermaster General December 16, 1940. The correct amount of total damages is therefore $32,355.03.

512

ing the jury in his charge that the special defense contained in the answer was not evidence, and that there was no evidence as to any former trial of the case, and that the jury were obliged to reach their verdict entirely upon the evidence before them. By that time, however, the harm had been done and was beyond the possibility of repair, and it had been done unnecessarily. The situation was not like that which sometimes occurs in a conspiracy case when the confession of one conspirator must be received upon the trial of several defendants, notwithstanding its prejudicial effect upon them, and their only recourse is to secure an instruction that the confession of their co-defendant is not evidence against them. In the pending case the reading of the portion of the answer objected to served no useful purpose and could only have the effect of prejudicing the jury against the United States; and there was no reason to permit it to be read to the jury, for in the federal court a judge is under no obligation to follow the procedural method of the state courts. See Guthrie v. Great American Ins. Co., 4 Cir., 151 F.2d 738, 740; Cohen v. Travelers Ins. Co., 7 Cir., 134 F.2d 378, 384; Wachsman v. Tobacco Products Corporation, 3 Cir., 129 F.2d 815, 819.

■ The instructions given by the judge to the jury at the conclusion of the evidence with respect to the failure of the defendants to testify or offer any testimony whatsoever were so framed as to minimize this important feature of the trial. The jury might well have been told that the failure to testify on the part of business men charged with defrauding the government in a time of national emergency, where the facts were peculiarly within their knowledge, might fairly give rise to the inference that the defendants believed that if they appeared upon the stand and subjected themselves to cross examination, their testimony would be damaging to their case. Plunkett v. Levengston, 7 Cir., 258 F. 889; Adamson v. California, 332 U.S. 46, 56, 67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223; Wigmore on Evidence, 3d Ed. 1940, § 289. But instead of giving an instruction of this character, the judge included the following statement in his charge: "The defendants have requested that I instruct you further, and I now instruct you that the defendants had a perfect right under the law to depend on the weakness of the government's case. Defendants had a right, in view of the fact that the law does cast upon the plaintiff the burden of proof, that is the burden of proving its case, to decline to offer any evidence whatever, as they did in this case. You are instructed when you consider that situation, if you consider it, you should bear that in mind, that they were not required to testify or offer any evidence, and you should consider the fact that no evidence was offered by defendants only as a circumstance enabling you to arrive at what the facts in the case are. You may give it such consideration as you think it should receive, that is failure to offer evidence, bearing in mind the defendants were within their rights in relying, as they contend, on the weakness or failure of the government to make out its case by the greater weight of the evidence as the law required."

■ Another incident, doubtless harmful to the United States was the ruling of the District Judge that the defendants should have the opening and closing argument before the jury. This unusual procedure is approved by the rules of the North Carolina courts in all cases, civil and criminal, when the defendant introduces no evidence. It is regarded as conferring a substantial right upon the defendant and a new trial may be awarded if it is denied. Rules of Practice for the Superior Courts of North Carolina, Rule 3, 221 N.C. 574; State v. Raper, 203 N.C. 489, 166 S.E. 314; State Trust Co. v. Braznell, 227 N.C. 211, 41 S. E.2d 744.

The same practice was recognized in Georgia in Moore v. Carcy, 116 Ga. 28, 42 S.E. 258, where the Supreme Court of the state said that it could not trace the origin or reason for the rule but would not disturb it because of its antiquity. In the pending case, as we have seen, the District Judge was under no duty to follow the state practice which seems to reward a litigant for withholding his contribution to

the search for truth which a law suit is designed to promote.[3]

We have no doubt that in this setting the unnecessary disclosure to the jury of the acquittal of the defendant in the criminal case constituted of itself a prejudicial error. There is, moreover, a fundamental and conclusive reason which requires us not only to reverse the judgment but to remand the case in order that judgment may be entered for the United States. In the federal courts the judge should direct a verdict for either party, even if the party has the burden of proof, when the facts are so convincing that reasonable men could not differ as to their significance; and this is especially true when there is no conflict in the evidence. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Horning v. District of Columbia, 254 U.S. 135, 139, 41 S.Ct. 53, 65 L.Ed. 185; N. Jacobi Hardware Co. v. Vietor, 4 Cir., 11 F.2d 30; Marshall v. Hubbard, 117 U.S. 415, 6 S.Ct. 806, 29 L. Ed. 919; Macon County v. Shores, 97 U. S. 272, 24 L.Ed. 889. The principle is stated in Slocum v. New York Life Ins. Co., 228 U.S. 364, 369, 33 S.Ct. 523, 525, 57 L.Ed. 879, Ann.Cas.1914D, 1029, where it is said: " * * * When, on the trial of the issues of fact in an action at law before a Federal court and a jury, the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party."

The mere recital of the uncontradicted facts shows beyond all reasonable doubt that the cars and trucks, ostensibly rented to the contractors as the third party equipment of Jones, actually belonged to Grannis, and were listed in Jones' name so as to fraudulently increase the rental payable by the United States. Jones himself was unable to finance the business; the negotiations for the purchase of the cars were conducted by Jones and Sloan; the discounts on the purchase price were claimed and allowed on the assumption that Grannis was the buyer; the rebate on the purchase price of the Ford cars was paid to and retained by Grannis; the arrangements with the banks for financing the purchases were made by Grannis and Sloan; the purchase money was furnished by Grannis or borrowed on his credit; the monies on deposit in the banks were subject to withdrawal only by Sloan, and the checks from the rentals paid by the United States were delivered to Sloan and deposited in the banks, subject to his order.

These facts are not offset by the device of substituting the name of Jones on the rental records and title papers, since this was merely the means by which the fiction was given verisimilitude and the trucks and cars which actually belonged to the contractors were made to appear as third party equipment. It was for this obvious purpose that the cars were listed as belonging to Jones on the third party rental schedule, that the bank deposits were given the superficial appearance of his money, and that the rental checks were made out in his name, although mailed to Grannis so as to come in Sloan's possession. It is no answer that the records do not show that any of the rent monies were paid to Grannis, but indicate that the profits of the business finally came into the hands of Jones and that he paid a federal income tax thereon. It was not to be expected that records carefully prepared to give the semblance of reality would themselves expose the unlawful plan. It is not surprising that the defendants were alive to the probability that the income tax returns of

---

[3] The testimony in the case does not justify the argument presented to the jury in the concluding argument in the District Court, and repeated in this court, that a government inspector "investigated every detail of this whole transaction" and testified that he found nothing wrong. The witness in question was an internal revenue agent and auditor, who examined the records of Grannis and the records of the banks with reference to the income tax returns of the defendants. He found that Jones had reported all the third party rentals paid in his name, and no record evidence that Grannis got any part of the money.

514

persons having large business transactions with the United States would be investigated by agents of the internal revenue. It is not unusual for persons engaged in unlawful enterprises to pay a tax to the federal government on the income therefrom. See Tax Dodgers, by Elmer L. Irey.

■ Moreover, the case is no stronger for the defendants if their contention be accepted that the cars were technically the property of Jones, and that only he received the profits of the business. Even if this assumption be made, it is still true that he had nothing to do with the purchase or delivery of the equipment or the management of the rental business, all of which was arranged by Grannis and Sloan so that he was enabled to enjoy a substantial profit without actual risk or effort on his part. In this view, he was merely a nominal figure and the evidence clearly shows that if this fact had been disclosed to the government agents in accordance with the contractor's promise to use his best efforts in all acts under the contract to protect and subserve the interest of the government, they would not have appraised the equipment at the higher figures to which a third party lessor was entitled under the government practice. The suppression of the truth was in itself a fraud upon the government.

It is contended that Grannis had no motive to make the pretense that Jones was a third party lessor in his own right since the government's testimony showed that Grannis was himself an actual third party lessor to the extent of several hundred thousand dollars in the rental of equipment to the contractor engaged in the construction of Fort Bragg, a site much nearer his home than Fort Davis, and hence it would have been more profitable for Grannis to have sent the so-called Jones equipment to Fort Bragg. This proves, however, that Grannis, despite his promises to the government, preferred to rent equipment to another government contractor rather than to use it for less compensation on his own project. He had been given the contract after demonstrating that he had the resources to prosecute the work, but when it was found that additional equipment was needed, he obtained it in the name of another rather than in his own name so as to increase the profits.

The unfavorable inferences against the defendants, which are justified by these facts, are fortified beyond all reasonable doubt by the failure of the defendants either to testify themselves or to offer any testimony on their own behalf.

■ A special defense is raised on behalf of the defendant Grannis by reason of his death on September 10, 1948, pending this appeal. The contention is that the suit is based upon a penal statute and was therefore abated upon his death in accordance with the common law rule that penal actions die with the person. 1 Am. Jur. 102; Porter v. Montgomery, 3 Cir., 163 F.2d 211; Bowles v. Farmers Nat. Bank, 6 Cir., 147 F.2d 425. In mitigation of this rule the federal statutes provide, 28 U.S.C.A. § 2404, that a civil action for damages commenced by or on behalf of the United States shall not abate on the death of a defendant but shall survive and be enforceable against his estate as well as against the surviving defendants. The defendants contend, however, that this statute does not keep the present suit alive as to Grannis because it is not a civil suit but a penal action. The courts have been divided in their decisions as to the nature of R.S. § 3490, 31 U.S.C.A. § 231, under which this action was brought. Compare United States ex rel. Brensilber v. Bausch & Lomb Optical Co., 2 Cir., 131 F.2d 545, affirmed by a divided court, 320 U.S. 711, 64 S.Ct. 187, 88 L.Ed. 417; Cahill v. Curtis Wright Corporation, D.C.W.D. Ky., 57 F.Supp. 614, with the United States v. Griswold, D.C.Or., 24 F. 361; United States ex rel. Rodriguez v. Weekly Publications, D.C.S.D.N.Y., 68 F.Supp. 767. But in our opinion, the controversy is set at rest in United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443, where the court rejected the defense of double jeopardy raised by the defendants who had been prosecuted criminally for defrauding the United States under R.S. § 5438 and were being sued for damages under R.S. § 3490. In discussing the nature of the remedy under the latter sec-

tion, the court said 317 U.S. at pages 550, 551, 552, 63 S.Ct. at page 387, 87 L.Ed. 443:

"This remedy does not lose the quality of a civil action because more than the precise amount of so-called actual damage is recovered. As to the double damage provision, it cannot be said that there is any recovery in excess of actual loss for the government, since in the nature of the qui tam action the government's half of the double damages is the amount of actual damages proved. But in any case, Congress might have provided here as it did in the anti-trust laws for recovery of 'threefold damages * * * sustained, and the cost of suit, including a reasonable attorney's fee.' 15 U.S.C. § 15, 15 U.S.C.A. § 15.

\* \* \* \* \* \*

"It is argued that the $2,000 'forfeit and pay' provision is 'criminal' rather than 'civil' even if the double damage feature is not. The words 'forfeit and pay' relate alike to the $2,000 sum and the double damages. The use of the word 'forfeit' in conjunction with the word 'pay' does not force the conclusion that the provision is criminal. No one doubts that Congress could have accomplished the same result by authorizing 'double' or 'quadruple' or 'punitive' damages or a lump sum payment for attorney's fees, or by definition of the elements of 'actual damages.' Special consequence cannot be drawn from the use of the word 'forfeit'. While this might under other circumstances be an appropriate word to suggest a fine upon the failure to pay which an individual might be imprisoned, no such punishment is provided here upon default in payment. The words 'forfeit and pay' are wholly consistent with a civil action for damages. Atchison, T. & S. F. R. Co. v. Nichols, 264 U.S. 348, 350-352, 44 S.Ct. 353, 354, 68 L.Ed. 720; cf. Hepner v. United States, 213 U.S. 103, 104-111, 29 S.Ct. 474, 475, 478, 53 L.Ed. 720, 27 L.R.A.,N.S., 739, 16 Ann.Cas. 960.

"It is true that 'Punishment, in a certain and very limited sense, may be the result of the statute before us so far as the wrongdoer is concerned,' but this is not enough to label it as a criminal statute.

Brady v. Daly, 175 U.S. 148, 157, 20 S.Ct. 62, 65, 44 L.Ed. 109. *We think the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole.*" (Italics supplied.)

See also Barnes Coal Corporation v. Retail Coal Merchants Ass'n, 4 Cir., 128 F. 2d 645; Sullivan v. Associated Billposters and Distributors of United States and Canada, 2 Cir., 6 F.2d 1000, 42 A.L.R. 503; cf. Helvering v. Mitchell, 303 U.S. 391, 401, 58 S.Ct. 630, 82 L.Ed. 917.

The government contends, as we have seen, that it is entitled to damages in the sum of $32,355.03 and in addition to the sum of $2,000 for each of the defendants' acts prohibited by R.S. § 3490. These acts, the government says, include not only each of the ten vouchers covering the fictitious claims for the Jones rental presented to the United States, but also 130 additional violations consisting of the schedules attached to the vouchers for each of the 130 cars and trucks which contained false statements as to the ownership and valuation of the vehicles, that is to say, the government claims the sum of $280,000 for 140 violations at $2,000 each. In our opinion the defendants are liable for only ten violations involved in the false vouchers, or $20,000 in all. It was held in United States ex rel. Marcus v. Hess, 317 U.S. 537, 552, 63 S.Ct. 379, 87 L.Ed. 443, that the government was entitled to a forfeiture for each of 56 separate P. W. A. projects for which collusive bids were submitted, but no contention was made that every one of the hundreds of forms falsely filled out by the defendants constituted a separate offense. The government's present contention was specifically rejected in United States v. Rohleder, 3 Cir., 157 F.2d 126, in which the court imposed the $2,000 forfeiture for each of sixteen major contracts and subcontracts on which the defendants had defrauded the government, but refused to impose the forfeiture for each of ninety purchase orders executed in connection with the contracts. The court said that

the frauds were committed with respect to the contracts and that the purchase orders were incidental to the contracts and not definite projects themselves. We are in accord with this decision and hold that $20,000 was the proper measure of the forfeitures due the government.

Under the statute, the United States is therefore entitled to a judgment in the sum of $20,000, and in addition, the sum of $64,710.06, double the amount of damages sustained by it, or a total of $84,710.06, together with the costs of suit; and the judgment of the District Court is reversed and the case remanded with directions to enter a judgment for the United States in the sum indicated.

Reversed and remanded.