UNITED STATES of America,
Plaintiff,

v.

FOSTER WHEELER CORPORATION,
Defendant.

No. 64–Civ. 3419.

United States District Court,
S. D. New York.

July 31, 1970.

Whitney North Seymour, Jr., U. S. Atty. Southern District of New York, for the United States of America; by H. Thomas Coghill, David M. Brodsky, Asst. U. S. Attys., of counsel.

Kissam & Halpin, New York City, for defendant Foster Wheeler Corporation.

CROAKE, District Judge.

## MEMORANDUM
## PRELIMINARY STATEMENT

This is an action brought by the United States of America (the Government) to recover damages from defendant Foster Wheeler Corporation (Foster Wheeler) for fraud under the False Claims Act (31 U.S.C. § 231 *et seq.*) and under common law. The alleged fraud arises out of the negotiations which preceded a contract between the Government and Foster Wheeler dated December 12, 1958, pursuant to which Foster Wheeler manufactured and installed ship boilers for the United States Navy. Jurisdiction of this Court is predicated upon 28 U.S.C. § 1345 and 31 U.S.C. § 232(A).

The complaint, filed on November 10, 1964, alleges three claims, two of which are based upon the False Claims Act and the third upon common law principles. The Government alleges that it suffered damages of $141,242 by reason of Foster Wheeler's alleged misrepresentations and, pursuant to the provisions of the False Claims Act, seeks double damages in the amount of $282,484, plus certain forfeitures. In its pretrial memorandum and the subsequent pretrial order of this Court, the Government's claim for actual damages was amended to $132,200 and its total claim to $264,400 plus the previously mentioned penalties.

Foster Wheeler's answer, filed on April 1, 1965, denied the material allegations of the Government's complaint.

## FINDINGS OF FACT

In September of 1958, the defendant, Foster Wheeler, learned that the Navy was having difficulty with the boilers on its DL2 and DL3 vessels, which had been designed by a competitor of the defendant. (Jankowski 382.) Foster Wheeler also learned that the Navy was interested in replacing these boilers with either of two models manufactured by their company—the DD–936 or the DDG type boiler. (*Ibid.*)

On September 19, 1958, the Marine Department of Foster Wheeler received a memorandum from Hugh E. Carleton, the company's Washington representative, advising that the Navy decided to use a DD 936 type boiler, twenty of which Foster Wheeler had previously built under a Bethlehem Steel Company (Bethlehem) subcontract for the Navy in 1954 to 1956. (Jankowski 382–383, 441; Mitchell 557.) By this time Foster Wheeler knew that the Navy was interested in procuring the boilers on a non-competitive basis and also knew that it was going to be a "rush job." (Carleton 335, 350.)

On October 1, 1958, the Bureau of Ships of the Navy Department issued a Request for Proposal (Negotiated Fixed Price Contract) which, in effect, invited Foster Wheeler to make an offer to the United States to sell replacement boilers and related spare parts and services for two U. S. Navy frigates at a proposed price to be determined by Foster Wheeler. (Govt.Exh. 1; Vigotsky 6–9, 11–14; Oberblatt 265; Memorandum 7.)

On October 13, 1958, Foster Wheeler, through its Marine Department, submitted to the Navy the completed Request for Proposal in which it offered to manufacture the eight boilers in question for a total price of $1,825,136.00. Govt.Exh. 1.) Submitted with the proposal was a "Cost and Price Analysis" form denominated "D633" which con-

tained an itemized breakdown of the estimated costs totaling $1,548,341, a 10% profit of $154,835, a 5% escalation of $85,160 and $36,800 estimated charge for field services included in the proposed price of $1,825,136. (Govt.Exh. 3; Vigotsky 14; Carleton 336–39; Haase 356–57, 367–68; Memoranda 11–16.)

The major items on the Form DD 633 containing Foster Wheeler's proposal were as follows:

| | |
|---|---|
| Direct Material | – $491,715.00 |
| Purchased Parts | – 270,192.00 |
| Direct Manufacturing Labor | – 226,610.00 |
| Manufacturing Burden | – 407,900.00 |

Form DD 633 contained the following printed certification which appears above the signature of the Foster Wheeler representative, Hugh E. Carleton, who signed the proposal under date of October 13, 1958:

"This is to certify that the information contained in this proposal has been based upon or compiled from the books and records of this company and is accurate to the best of my knowledge and belief." (Govt.Exh. 3.)

The Navy was unwilling to accept the proposal as made because its negotiator, Solomon Vigotsky, thought the price of $1,825,136 was too high. Negotiations ensued between the Navy, represented primarily by Vigotsky, and representatives of Foster Wheeler, Henry Jankowski, Robert W. Haase and Carleton. (Vigotsky—14–22, 50–2, 85–6.)

In connection with its review of Foster Wheeler's proposal, the Navy requested a breakdown of the lump sum estimated cost figures for "Direct Material" and "Purchased Parts" contained in the Cost and Price Analysis (DD 633) that had been submitted by Foster Wheeler with its proposal. (Deft.Exh. G; Vigotsky 14–18; Memorandum 18.)

Such a breakdown was furnished by Foster Wheeler in a letter to the Navy, dated October 22, 1958, which appeared to substantiate the lump sum estimated cost figures for "Direct Material" and

"Purchased Parts" contained in the Cost and Price Analysis (DD 633). (Govt. Exh. 4; Govt.Exh. 17 A9; Vigotsky 15–18; Memorandum 18.)

During the negotiations, in an effort to justify the proposed price and the estimated costs shown on the Cost and Price Analysis (DD 633) and October 22, 1958 letter, Foster Wheeler submitted a schedule purporting to show a comparison of

(i) the costs for "Direct Material," "Purchased Parts," and "Direct Labor" it had actually incurred in manufacturing identical boilers on another contract a few years before,

(ii) the actual costs on the earlier contract revised to date, i. e., adjusted for increased cost of labor material, etc., and

(iii) the estimated costs included in the proposed price as per the Cost and Price Analysis (DD 633). (Govt.Exh. 5; Govt.Exh. 17 A9; Govt.Exh. 27; Govt.Exh. 21; Vigotsky 27–32, 49, 62–69, 77–85; Govt.Exh. 6; Govt.Exh. 8; Jankowski 514–17; Carleton 325–26; Haase, 357–58, 369–70; Memoranda 50, 51.)

The first column of the Schedule of Comparative Costs prorated the defendant's "actual costs" for direct material, purchased material and direct labor under the 20 boiler 1954 Bethlehem subcontract to the proposed Navy contract for eight boilers. The second column of said exhibit entitled "Price revised to date" purportedly applied a 33% escalation factor to the figures contained in the first column as a result of increased cost of materials and labor. The third column of the exhibit reflected the bid price for the items in question as shown on the "DD 633."

On November 17, 1958, representatives of Foster Wheeler again met with Navy representatives to conduct further negotiations with respect to the contract price. There is conflicting testimony, however, as to what representations were made at that conference to the Government concerning whether the defendant

had sustained an 11% loss on an earlier contract with Bethlehem involving identical boilers or whether the company had failed to realize by 11% the gross profit of 17% it anticipated it would make under the contract.

On December 12, 1958, a contract (NObs 76301) was entered into between Foster Wheeler and the Government under which Foster Wheeler agreed to furnish the eight boilers in question at a total price of $1,817,404.00. (Govt.Exhs. 9, 10.)

Payments under the contract by the Government commenced in June 1959 and the final payment was made in May 1961. Because of various amendments and changes made after the contract was entered into the final price was $1,866,-200. (Govt.Exh. 23.)

In early 1962 the General Accounting Office ("GAO") assigned an auditor, Mrs. Rose Oberblatt, to make a routine review of Foster Wheeler's government contracts. (Oberblatt—137–39.)

In reviewing contract NObs–76301, Mrs. Oberblatt discovered that Foster Wheeler had only incurred costs of $1,-261,300 against the final price of $1,866,-200. The fact that Foster Wheeler had realized a profit of approximately $605,-000, or 31% of the final price, and 48% of cost (as compared to their estimated profit on the DD 633 of 10% of cost), caused Mrs. Oberblatt to make an intensive review of the contract and the negotiations that preceded it. (Govt.Exh. 16 A–1; Oberblatt 139–40, 156–60; Memoranda 2, 5.)

Mrs. Oberblatt's review revealed that certain statements and information made and provided by Foster Wheeler during the contract negotiations and relied on by the Government were apparently false and misleading in the following respects:

a. The estimated costs contained in the Cost and Price Analysis (DD 633) were not based on Foster Wheeler's books and records and were not accurate as certified in that the company's Cost Estimating Section had prepared an estimate of costs which was based on its books and records and which would have resulted in a contract price of $1,556,900. These figures were increased in the amount of $182,400. to $1,739,336. by Foster Wheeler (Memorandum—Point II, 18, et seq.)

b. The breakdown of the lump sum cost figures shown on the Cost and Price Analysis (DD 633) for "Direct Material" and "Purchased Parts" set forth in Foster Wheeler's letter to the Government, dated October 22, 1958, was artificial and designed to hide the fact that the estimated cost figures on the Cost and Price Analysis (DD 633) had been increased. (Memoranda 18, 25, 26, 27, 28, 31–43.)

c. The schedule submitted by Foster Wheeler comparing estimated costs with actual costs on the prior contract involving identical boilers was likewise false and misleading. (Memorandum—Point III, 50, et seq.)

d. The oral statements allegedly made by representatives of Foster Wheeler at the November 17, 1958 negotiating conference that an 11% loss had been sustained on the earlier contract involving identical boilers were not substantiated by the company's records which revealed that Foster Wheeler had realized a profit of 6.7% on that contract. (Memorandum—Point IV, 61, et seq.)

As indicated above, on November 10, 1964, the Government filed the complaint in this case pursuant to the False Claims Act, 31 U.S.C. §§ 231–233 claiming damages in the amount equal to twice the damages actually sustained, i. e., $264,-400.00, plus a penalty of $2,000.00 for each false statement or voucher submitted. The answer, filed on April 1, 1965, as stated, denied the material allegations of the complaint.

DISCUSSION

Under the False Claims Act,[1] the Government must prove by clear,

---

1. 31 U.S.C. § 231 states, in part, that "Any person * * * who shall make or cause to be made, or present or cause to be pre-

sented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any

convincing and unequivocal evidence that it was defrauded. United States v. Ueber, 299 F.2d 310, 314 (6th Cir. 1962). To sustain its burden of proof under this Act the Government is required to prove a false, fictitious or fraudulent claim against the United States, with knowledge by those submitting the claim that it is false, fictitious or fraudulent. United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943); Fleming v. United States, 336 F.2d 475, 480 (10th Cir. 1964), cert. denied, 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed. 2d 795 (1965); United States v. Grannis, 172 F.2d 507 (4th Cir.), cert. denied, 337 U.S. 918, 69 S.Ct. 1160, 93 L.Ed. 1727 (1949).

██ Contrary to defendant's assertions, the United States does not have to prove an intent to defraud by those submitting the false claims and vouchers but rather need only prove, as a matter of law, that "the claimant made a claim upon or against the Government of the United States, knowing it to be false * * *." Fleming v. United States, supra, 336 F.2d at 479–480.

The issue thus presented to the Court in this case is whether the Government sustained its burden of proof with respect to the specific charges of fraud set forth in the pretrial order as follows:

1. The Form DD 633 (Govt.Exh. 3) was not based upon Foster Wheeler's books and records.

2. The breakdown of costs set forth in Foster Wheeler's letter of October 22, 1958 to BuShips (Govt. Exh. 4) was artificial and designed to conceal that the Marine Department had falsified the Form DD 633.

3. The schedule of comparative costs (Govt.Exh. 5) was false, misleading and erroneous.

4. Foster Wheeler made an oral representation that it had suffered an 11% loss on the 1954 Bethlehem subcontract and that this representation was false.

Foster Wheeler claims that the evidence adduced at trial establishes that Form DD 633 (Govt.Exh. 3), which is a cost and price analysis submitted by that company to the Navy with respect to the boilers in question, was based upon their books and records to the extent possible and was free of fraud. In support of this position the defendant argues that each of the figures found their basis in estimates prepared by the Estimating and Accounting Departments of the Company, which were necessarily amplified by the judgment and experience of the Marine Department.

In opposition to the defendant's position the Government claims that at the time Foster Wheeler determined the price it would charge the Navy it knew there would be no competition and little likelihood that the Navy would go to another manufacturer. The Government argues that, with this information in mind, Foster Wheeler first determined a price that would insure it excessive profits and then created false cost figures and other false information in order to substantiate and justify the price. Foster Wheeler accomplished this, according to the Government, by taking the detailed estimate (Govt.Exh. 16 A4, p. 1; Deft.Exh. L) prepared by its Estimating Section (Jankowski 396),[2] which had come up with a total cost figure of $1,242,380.00 for the main boilers, com-

claim upon or against the Government of the United States * * * knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry * * * shall forfeit

and pay to the United States the sum of $2,000.00, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit."

2. Preparation of the detailed estimate by the Estimating Section of the Marine De-

plete, and marking it up by 40% (Jankowski 496–501; Govt.Exh. 34; Govt. Exh. 16 A2–1J, p. 1).[3] This method of determining the price employed by the defendant improperly assured excessive profits to Foster Wheeler and was never disclosed to the Navy.

At trial the Government demonstrated that the mark-up in the instant case of 40% was not in accordance with Foster Wheeler's normal practice (Haase 353) which was to apply a 17% mark-up (or preferably a little more) to the estimate to cover general sales and administrative overhead and profit (*Ibid.*). In fact, 17% was the mark-up applied to the estimated costs for the prior Bethlehem contracts (Deft.Exhs. O, P. Q).

The Government further proved at trial that although Foster Wheeler marked up its estimate by 40% it reported on the Cost & Price Anaylsis (Govt. Exh. 3) that it had used a mark-up of only 25.32% as follows: 8½% General and Administrative Expenses (Line 16 of Govt.Exh. 3); 10% profit (Line 18 of Govt.Exh. 3) and 5% escalation (Line 20 of Govt.Exh. 3).[4] As a result of this inconsistency, Foster Wheeler could not report on Line 14 the total estimated costs in its detailed estimate of $1,242,380 (Govt.Exh. 16 A⅘, p. 1; also Deft.Exh. L). Instead, Foster Wheeler had to create a greater total estimated cost figure, i. e., $1,427,042 (Govt.Exh. 3, Line 14), that would support the predetermined price.

Had Foster Wheeler used the mark-ups which it reported on the Cost and

Price Analysis (Govt.Exh. 3) and applied them to the cost figures in the detailed estimate for the boilers which totalled $1,242,380, and which were supported by their books and records, the proposed price for 8 boilers, complete, would have been computed as follows (See Govt.Exh. 18 W5):

| | |
|---|---|
| Estimated Cost | $1,242,380 |
| (Govt.Exh. 16 A4; also Deft.Exh. L) | |
| 1 | |
| General and Administrative 8.5% | 105,602 |
| | 1,347,982 |
| | 134,798 |
| | $1,482,780 |
| Escalation 5% | 74,134 |
| Price that should have been proposed for the main boilers complete | $1,556,919 |

Therefore, the price that should have been proposed by Foster Wheeler for the main boilers complete, $1,556,919, was $182,417 less than the $1,739,336 (Govt. Exh. 1) actually proposed. In other words, by using the 40% mark-up, Foster Wheeler had included in the proposed price $182,417 [5] which bore no relationship to anticipated costs which were spelled out in the detailed estimate or to the mark-ups for overhead, profit and escalation reported on the Cost and Price Analysis (Govt.Exh. 3). This sum of $182,417 was distributed among the estimated costs so as to support the mark-up of 25.3% reported to the Navy on the Cost and Price Analysis (Govt.Ex. 3).

It is the opinion of the Court that the testimony and exhibits presented at trial demonstrate that Foster Wheeler inflated the estimated costs shown on the Cost and Price Analysis (Govt. 3) after first

partment commenced as early as September 25, 1958 (Govt. Exh. 29, p. 67). The estimate was based on current market information and Foster Wheeler's prior experience in manufacturing identical boilers (Oberblatt 188, 191–2).

3. Jankowski also admitted that the Cost and Price Analysis (Govt. Exh. 3), which purportedly shows how the price was determined, was prepared after the price was determined by marking up the detailed estimate by 40% (Jankowski 499).

4. Because percentages of percentages are involved in figuring the mark-up (see

Govt. Exh. 3), the following calculations must be made to arrive at the total mark-up of about 25.32%:
8.5 G&A; plus
10.85 Profit (10% of 108.5%); plus
5.97% Escalation (5% of [8.5% G&A plus 10.85% Profit, or 119.-35%]).

5. Because of errors found by GAO in the detailed estimate and a reduction in the proposed price which occurred during negotiations, GAO concluded that the Government had been overcharged by only $132,200 and not $182,417.

arbitrarily determining the price to disguise the fact that a profit substantially higher than the 10% shown on the Cost and Price Analysis (Govt.Exh. 3) had been included in the proposed price.

Foster Wheeler's purported explanation that they did their work in a rush (as a "favor" to the Navy) is not persuasive. Evidence adduced at trial plainly shows that the defendant was duplicating boilers previously constructed for Bethlehem commencing in 1954 (Govt. Ex. 1 and 16 A2 1K). Thus, substantially all the engineering work, specifications, and other technical work had been done. Furthermore, a current detailed cost estimate was available prior to the submission of the proposal (Govt. Ex. 16 A⁴⁄₁, p. 1). Finally, Foster Wheeler did not request more time from the Navy to prepare the proposal or advise the Navy that it was done under time pressures (Haas 443–44). We therefore hold that the Government has sustained its burden of proof as to charge one.

The Government's second specific claim of fraud is directed at Foster Wheeler's letter of October 22, 1958 to BuShip (Govt.Exh. 4) which provides a breakdown of the "direct material" and "purchased parts" items shown on the Form DD 633. As to this charge defendant once again claims that the Government has failed to prove that this letter was fraudulent and designed to conceal that the figures on Form DD 633 were in fact falsified. In support of this position Foster Wheeler argues that the testimony with respect to the October 22 letter demonstrates that while the figures therein contained "minor errors," the letter constituted a complete disclosure to the Navy of the components which comprised "direct material" and "purchased parts" on Form DD 633. Defendant's position is not supported by the record of this case. At the trial, Mrs. Rose Oberblatt of GAO testified that she ascertained that the estimated cost figure for Direct Material shown on the Cost and Price Analysis (Govt.Exh. 3)

was $50,515 greater than the comparable figure shown on the detailed estimate (Govt.Exh. 16 A⁴⁄₁,; also Deft.Exh. L) (Oberblatt 177, 269–70). During the audit Foster Wheeler was unable to substantiate the increase (Oberblatt 171).

The spurious nature of the increase in the Direct Material Cost stated on the Cost and Price Analysis was disclosed in Mrs. Oberblatt's examination of the breakdown of the figure which was provided to the Navy on October 22, 1958 (Govt.Exh. 4) (Oberblatt 175–77). Testimony at trial indicates that in order to cover up the fact that an additional $50,515 had been included in the Direct Material Cost figure, Foster Wheeler, in its breakdown of that figure (Govt.Exh. 4, p. 1), juggled the weights of the various components—increasing weights of more expensive materials and decreasing weights of less expensive materials (Oberblatt 175–76). The net effect of these manipulations was to increase the Direct Material Cost figure by $50,515 without increasing the total weight of the Direct Material.

No plausible explanation was offered by the defendant as to how the $50,515.00 was computed other than the testimony by Jankowski that the $50,515.00 was a "guesstimate." (Jankowski 445.)

Likewise, testimony at trial established that fraud was present with respect to the breakdown of the "purchase parts" items of the October 22, 1958 letter. At trial evidence was presented which showed that Mrs. Oberblatt ascertained that the estimated cost figure for Purchased Parts shown on the Cost and Price Analysis, $270,192 (Govt.Exh. 3), was $24,472 greater than the comparable figure shown on the detailed estimate ($245,720) [6] (Oberblatt 171–72, 178–81; (Govt.Exh. 16 A2–1h, p. 1, A4; also Deft.Exh. L, G29 p. 62). 1

During the audit Foster Wheeler was unable to substantiate the increase (Oberblatt 171).

6. 8 x $30,715.00.

The questionable nature of this increase was disclosed in Mrs. Oberblatt's examination of the breakdown of the increased Purchased Parts cost figure which was provided to the Navy on October 22, 1958 (Govt.Exh. 4) (Oberblatt 178–181). The breakdown included $26,592 attributable to "miscellaneous" items from "various vendors" (Govt.Exh. 4). Oberblatt ascertained that $2,120 of this amount was attributable to smoke indicators and oil drip detectors manufactured by Wager (Oberblatt 178–81; Govt.Exh. 16 A2–1h, p. 1; also Deft. Exh. F2). The balance of $24,472, according to Jankowski's work paper, (Govt.Exh. 16 A2–1h, p. 1, also Deft. Exh. F2) dated October 20, 1958, used by him in preparing the breakdown was a "miscellaneous contingency" (Oberblatt 178–81; Govt.Exh. 16 A1–1h, p. 1, also Deft.Exh. F2). However, it was confirmed at trial that there weren't any purchased parts in the specifications or detailed estimate to cover the $24,472 miscellaneous contingency (Oberblatt 181). In order to cover up the fact that an additional $24,472 had been included in Purchase Parts, no mention of miscellaneous contingencies was made in the breakdown (Govt.Exh. 4, Oberblatt 181). Instead, the description "miscellaneous" from "various" vendors was used, thus leaving the impression that the figure was supported by actual miscellaneous Purchase Parts (Oberblatt 180–181). Testimony at trial indicates that this was also the impression of the Navy Negotiator, Vigotsky (Govt.Exh. 17 A9, p. 5).

Jankowski's testimony attempted to explain the manner in which he increased the estimated cost of purchased parts for the boilers in question. However, his explanation for the various changes in the cost per detailed estimate of such items as safety valves, feed water regulators and fibre frax insulation was, in the opinion of this Court, not persuasive and lends further support to the Government's position that the price had been determined via the 40% mark-up route.

We therefore hold that the Government has sustained its burden of proof as to charge two.

The Government makes its third specific charge of fraud with respect to the schedule of comparative costs (Govt.Exh. 5) which was submitted to Navy Negotiator, Solomon Vigotsky, to permit him to compare Foster Wheeler's bid price with the costs it had incurred under the 1954 Bethlehem subcontract.

Government's Exhibit 5 sets forth in comparison form three columns entitled "Actual Costs," "Price Revised to Date" and "Bid Price." The first column prorated defendant's actual costs for Direct Material, Purchased Parts and Direct Labor under the 20 boiler Bethlehem subcontract to the instant contract for eight boilers.

Defendant claims that the figures provided by them are completely supported by the books and records of Foster Wheeler—more specifically the schedule prepared by the Accounting Department and submitted to Jankowski (Deft.Exh. I). It is alleged that after receiving and reviewing Defendant's Exhibit I, Jankowski transferred the figures to his own work paper (Deft.Exh. K). Thereafter, these figures were forwarded to the Navy through Government Exhibit 5. Consequently, rather than evidencing a concealment of facts, defendant argues that this exhibit manifests an honest and good faith written disclosure of all material facts having a bearing on the propriety of the proposal price.

It is the Government's position that, in an effort to convince the Navy of the fairness of the price proposed, Foster Wheeler furnished the Navy with what was represented to be actual costs on the prior Bethlehem contracts. When the actual costs provided were marked up by a factor of 33% [7] to provide for the general increase in costs that had occurred since the boilers had been built for Bethlehem, the figures appeared to justify the price proposed.

---

7. An increase to which no objection was made.

However, the Government contends that the true costs on the Bethlehem contracts had been artificially increased in order to support the proposed price determined via the "40% mark-up route" and also to preserve the deception that had been implemented by falsifying the Cost and Price Analysis. This, according to the Government, resulted in "juggling figures" to justify an inflated and unreasonable price.

Testimony at trial demonstrated that Mrs. Oberblatt sought to determine the accuracy of the actual cost figures of Government Exhibit 5 during her audit (Oberblatt 210). The actual costs provided to the Navy were: [8]

| Direct Material | $356,500 |
| Purchased Parts | 203,000 |
| Direct Labor | 169,500 |

Mrs. Oberblatt obtained from Stout, a Foster Wheeler employee, the company's cost records showing the actual costs incurred on the prior Bethlehem contracts, and these costs were then adjusted by Stout to reflect the actual overhead costs incurred. (Oberblatt 211–13; Govt.Exh. 16, A5, A5–1, A5–2, A–8, A8–1, A8–2, A8–3 and A8–4.) This information was verified to Foster Wheeler's records by Oberblatt (Oberblatt 2–13–14). [9]

During the audit, Mrs. Oberblatt was provided with a work paper from Jankowski's file which contained a summary of (i) the actual costs on the 12 boiler job for Bethlehem (No. 3–37—3776–87), (ii) the actual costs on the 12 boiler job reduced to 8, and (iii) the actual costs on the 8 boiler job for Bethlehem (No. 3–37—3792–9) (Oberblatt 221–25; Govt. Exh. 16 A2–1e). [10] The average costs for 20 boilers were summarized on another Jankowski work paper (Govt.Exh. 16 A2–1d, also Deft.Exh. K). The record demonstrates that these costs summaries in Jankowski's own handwriting

did not support the actual cost figures given to the Navy (Overblatt 221–25).

The record further reveals that a number of unrelated cost items had been improperly included in Direct Material, Purchase Parts and Direct Labor by the Foster Wheeler Corporation. Moreover, at trial, defendant failed to adequately justify the method by which these cost figures supplied to the Navy had been arrived at. Upon hearing all the evidence, it is the opinion of this Court that these figures were arbitrarily raised to justify the price previously submitted to the Navy and that Foster Wheeler was guilty of falsifying these figures. We are therefore satisfied that the Government has sustained its burden of proof as to charge three.

The last specific charge of fraud made by the Government relates to the alleged misrepresentation by Foster Wheeler that it had suffered an 11% loss on the 1954 Bethlehem subcontract.

There isn't any question in this case that Foster Wheeler did not sustain an 11% loss on the prior Bethlehem contracts (Oberblatt 225–33, 292–96, 299–300; Govt.Exh. 16, A8, A8–1 through A8–4); that, in fact, a 6.7% profit had been earned as of the end of 1958 based on costs incurred at that time (Oberblatt 213–4); and that Foster Wheeler knew about this profit at the time of the negotiation of the price for this contract. (Deft.Exh. I, K.) The only question is whether Foster Wheeler ever told the Navy it had sustained an 11% loss on the prior Bethlehem contracts.

The defendant alleges that at the negotiation meeting on November 17, 1958, a discussion took place concerning Foster Wheeler's profit experience on the 1954 Bethlehem subcontract for twenty boilers. Robert W. Haase, Foster Wheeler's Marine Department Manager, testified that prior to attending this meeting he

---

8. See Govt. Exhs. 5, 6 at pp. 3 and 27.

9. The contracts were completed in 1955 (Oberblatt 214). The cost records Oberblatt was working with were cumulative to the end of 1961 (Oberblatt 214–15).

10. Govt.Exh. 16 A2–1e was Jankowski's work paper (Jankowski 489).

had established the actual profit realized by Foster Wheeler at that time on the Bethlehem subcontract and, furthermore, was aware that Foster Wheeler had anticipated a 17% profit on that job. Haase also stated that the actual profit realized by Foster Wheeler on the Bethlehem subcontract at that time was between 6 and 7%. Consequently, he knew that Foster Wheeler had failed to achieve by 11% its anticipated gross profit on the Bethlehem subcontract. (Haase SM 360, 370.) It is further alleged that the fact that Foster Wheeler had failed to realize by 11% its anticipated gross profit at the time of the negotiation meeting was made known to Vigotsky by Haase. (Haase SM 360.)

Solomon Vigotsky, the Navy negotiator, testified at trial that at the negotiating meeting held in Washington on November 17, 1958, he was told by one of defendant's representatives [11] that Foster Wheeler had sustained an 11% loss on the prior Bethlehem contracts (Vigotsky 25). Vigotsky's memorandum, dated December 16, 1958, written in the ordinary course of business, confirms this fact (Govt.Exh. 8, p. 3; Vigotsky 41–2; and see Govt.Exh. 17 A9, p. 2). Vigotsky testified that he was not told that Foster Wheeler had failed to realize by 11% the profit it anticipated on the Bethlehem contracts (Vigotsky 74–5).

Hugh E. Carleton, Foster Wheeler's Washington representative, testified at trial that at the meeting, one of the Foster Wheeler representatives had said that Foster Wheeler sustained an 11% loss on the Bethlehem contracts (Carleton 322). Then, when asked what kind of a loss they were talking about, he testified:

"[S]ince reading other testimony on the thing I have come to the conclusion when they said 11 per cent loss, they meant 11 per cent from what they intended to make on the contract." Carleton (322–23.) [12]

And finally Carleton testified he had never heard anyone from Foster Wheeler say: "On the Bethlehem contracts we lost money" (Carleton 323–324).

On cross-examination the following testimony from Carleton's deposition was read:

"Q Do you recall any statement by any of the people present as to the amount of profit or the per cent of profit or per cent of loss that Foster Wheeler had on those contracts?

"A Yes. Some of our people made the statement, I believe, that we had lost something to the tune of 10 or 11 per cent, or something in that order."
(Carleton 340.)

Carleton then denied reading the depositions of other Foster Wheeler employees, but admitted having discussions with other employees of the defendant concerning the 11% loss after his deposition in February 1967 (Carleton 340–341).

Robert W. Haase, Manager of Foster Wheeler's Marine Department (352), testified on direct examination that no one had stated that Foster Wheeler lost 11% in money (Haase 359), and suggested that Foster Wheeler had sustained an 11% loss in its gross profit (Haase 359–60).

On cross examination the following testimony from Haase's deposition was read:

"Q Did you make any statements to the Navy people about the profit and loss that Foster Wheeler incurred? Did you make any statements to the Navy people about the profit or loss that Foster Wheeler incurred on these Bethlehem contracts?

"A I don't recall what was said prior to being asked, 'Would you say

---

11. Carleton, Haase and Jankowski. Milliken of the Navy was also present.

12. Also at 324: "[S]ince that time I have read depositions of others and statements and I have a little clearer picture of what they were discussing."

you had an 11 per cent loss?' to which I replied yes." (Haase 369.)

Henry Jankowski also testified that at the meeting there was some discussion pertaining to lessened profits on the Bethlehem job (Jankowski 418). Jankowski knew at the time of the meeting that there was a profit of $365,049, but he didn't convert it into a percentage (Jankowski 418, 420). This represented a six or seven per cent profit (Jankowski 421).

To buttress Jankowski's testimony three documents were introduced that showed Foster Wheeler had marked up their total estimated costs on the Bethlehem contracts by 17% (Deft.Exhs. O, P and Q; Jankowski 421–27).[13]

On cross-examination the following testimony from Jankowski's deposition was read:

"Q  Was there discussion about the loss on the earlier contract.

\*  \*  \*  \*  \*  \*

"A  There was some exchange of conversation between the negotiator and Mr. Haase regarding a loss. The exact details of what this loss referred to, I don't recall, because I may have been doing something else at the time, looking through some notes or trying to pick up costs, etc., *but there was a reference to a loss per se.* Exactly what this meant, I wasn't sure, because I don't know when a loss is a loss, just exactly what that means." (Jankowski 506–07.) (Emphasis added.)

The Court is not persuaded by the flimsy testimony presented by the defendant in opposition to claim four of the Government. The evidence adduced at trial plainly indicates that Foster Wheeler did in fact make oral representations to the Navy that it had suffered an 11% loss on its 1954 Bethlehem subcontract when it actually realized a profit of between 6 and 7%. In light of the foregoing this Court finds that the Government has sustained its burden of proof as to count four.

Having satisfied its burden of proof under the False Claims Act, 31 U.S.C. 231 *et seq.*, the Government is entitled to double the actual damages of $132,209 or $264,418 plus a $2,000 forfeiture for each voucher submitted seeking payment with respect to the boilers. Both parties agree that there are seven vouchers involved, which are identified as 1, 2, 3, 4, 5, 8 and 9 in Government's Exhibit 23 (See also Defendant's Exhibit W). Accordingly, the Government is entitled to 7 forfeitures at $2,000 each or an additional $14,000 as the result of its fraud.

■ The Government is also entitled to interest on the single damages of $132,209 from the date of the last payment for the boilers, March 23, 1960,[14] because since that time the defendant has wrongfully been in possession of and had the use of money that was rightfully the Government's. United States v. Carb, Civ. No. 16258 (E.D.N.Y. 12/21/60; *cf.* United States v. Rodiek, 120 F.2d 760, 761 (2d Cir. 1941), aff'd per curiam by an equally divided court, 315 U.S. 783, 62 S.Ct. 793, 86 L.Ed. 1190 (1942); Jones v. United States, 258 U.S. 40, 49, 42 S.Ct. 218, 66 L.Ed. 453 (1922); United States v. U. S. Fidelity & Co., 236 U.S. 512, 35 S.Ct. 298, 59 L.Ed. 696 (1915). The accumulated interest as of March 22, 1970 is $79,325.40.[15]

---

13. Apparently Jankowski first got the idea for Foster Wheeler's explanation in July 1962 when he was trying to come up with a plausible explanation for Oberblatt (Govt.Exh. 16 A8, p. 2; Oberblatt 291–296, 304–05).

14. The payment against the last boiler invoice, identified as #9 in Govt. Exh. 23, was made on March 23, 1960.

15. 6% on $132,209 from March 23, 1960 to March 22, 1970.

In summary, the total damages as of March 22, 1970, are:

| | |
|---|---|
| Actual Damages | $132,209 |
| Doubled | 132,209 |
| Forfeitures at $2,000 ea. | 14,000 |
| Interest | 79,325.40 |
| | $357,743.40 |

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter.

2. The complaint states claims upon which relief can be granted to the Government. Rainwater v. United States, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958); United States v. McNinch, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958); United States v. Veneziale, 268 F.2d 504 (3d Cir. 1959).

3. The complaint was timely brought and within the applicable Statute of Limitations. United States v. Ueber, 299 F.2d 310 (6th Cir. 1962); United States v. Goldberg, 256 F.Supp. 540 (D.Mass. 1966); United States v. Globe Remodeling Co., 196 F.Supp. 652 (D.Vt.1961).

■ 4. *First Claim*

Foster Wheeler made false claims for payment upon the United States, knowing the claims to be false, fictitious, or fraudulent.

5. *Second Claim*

Foster Wheeler used false bills, receipts, vouchers, accounts, and certificates for the purpose of obtaining payment of claims upon the United States, knowing that the bills, receipts, vouchers, accounts and certificates contained fraudulent and fictitious statements.

6. *Third Claim*

a. Foster Wheeler intentionally made false statements to the United States, which were material and upon which the United States relied. United States v. Silliman, 167 F.2d 607, 611 (3d Cir.), cert. denied, 335 U.S. 825, 69 S.Ct. 48, 93 L.Ed. 379 (1948).

b. Foster Wheeler negligently made misrepresentations to the United States, which were material and upon which the United States relied. Courteen Seed Co. v. Hong Kong Corp., 245 N.Y. 377, 157 N.E. 272 (1927).

c. Foster Wheeler overcharged the United States by making statements containing misrepresentations which were material and upon which the United States relied. United States v. Silliman, *supra.*

■ 7. Foster Wheeler is liable to the United States for double the amount of damages sustained, plus interest, plus forfeitures of $2,000 for each false and fictitious claim for plaintiff, plus the costs and disbursements of this action. Rainwater v. United States, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958).

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion constitutes the Court's findings of fact and conclusions of law.

Judgment is hereby directed for the plaintiff United States against the defendant Foster Wheeler Corporation in the amount of $357,743.40.

So ordered.